UNITED STATES of America, Plaintiff,

v.

7,216.50 ACRES OF LAND, MORE OR LESS, SITUATE IN ABBEVILLE COUNTY, STATE OF SOUTH CAROLINA, and The Mead Corporation et al., Defendants.

Civ. A. No. 77–898.

United States District Court, D. South Carolina, Greenwood Division.

July 29, 1980.

David A. Clarke, Jr., U. S. Dept. of Justice and J. D. McCoy, III, Asst. U. S. Atty., Greenville, S. C., for the government.

W. Francis Marion, and Andrew J. White, Jr., of Haynsworth, Perry, Bryant, Marion & Johnstone, Greenville, S. C., for defendants, Mead Corporation and Brunswick Pulp Land Co.

## FINDINGS OF FACT & CONCLUSIONS OF LAW

HEMPHILL, District Judge.

This land condemnation case was heard by this court, sitting without jury, on June 16, 1980, and continuing thereafter. Plaintiff was represented by J. D. McCoy, III, J. William Boone, and John Davis, Esquires, all of the Department of Justice. Defendants, The Mead Corporation (hereinafter "Mead") and Brunswick Pulp Land Company, were represented by W. Francis Marion and Andrew J. White, Jr., Esquires, of the firm of Haynsworth, Perry, Bryant, Marion & Johnstone.

Witnesses on the part of plaintiff and defendants were sworn and examined, and exhaustive evidence, oral and documentary, was introduced on behalf of the respective parties. This court viewed (from a helicopter, at request of plaintiff) the subject property as well as other alleged comparable properties in Georgia and South Carolina. Oral arguments were presented by respective counsel and all matters were taken

under advisement by this court. Having now considered the above, the documentary and visual evidence, testimony, and arguments of counsel, this court, upon the credible evidence before it publishes and files (in accordance with Rule 52, Federal Rules of Civil Procedure) its:

## FINDINGS OF FACT

1. Mead, on May 12, 1977, was the sole fee simple owner of tracts 900–1, 900–2, and 900–3, which are the subject of this action and which are located in Abbeville County, South Carolina; at that time, Brunswick Pulp Land Company managed the tracts for Mead. Approximately 7,216.-50 acres were originally condemned in this proceeding. Mead is the only entity entitled to receive the just compensation to be awarded by this court.

2. The Russell Dam project, formerly known as Trotter Shoals, was authorized by Congress on November 7, 1966, by Public Law 89–789, pursuant to the Flood Control Act of 1966; and pursuant to such authority the United States of America, on May 12, 1980, filed a Notice of Taking of the above Mead properties and deposited into the registry of the court $2,376,000.00 as estimated just compensation. On June 2, 1977, Mead and Brunswick Corporation served a Notice of Appearance and Answer which contested the right of the plaintiff to condemn the aforesaid properties. The Richard B. Russell Dam, now under construction (a current row between plaintiff and contractors about current cement quality temporarily causes a halt) is located on the Savannah River about midway between existing Hartwell Reservoir, upstream, and Clark's Hill Reservoir, downstream.)

3. This court previously upheld the right of plaintiff to condemn and take the aforesaid properties; the only issue now remaining is the determination of the just compensation which Mead is entitled to receive.

4. On April 23, 1980, attorneys for plaintiff and for Mead and Brunswick Pulp Land Company filed with this court their written Stipulation as to Partial Settlement whereby it was agreed, *inter alia*, that the land value of 6,016.5 acres of the subject property and the timber value of the entire 7,216.5 acres was $1,979,428.50, thus leaving the land value of the remaining 1,200 acres for this court's determination; it was further stipulated that the highest and best use of the remaining 1,200 acres (hereinafter called the "subject tract") was that of a pulp and paper mill site.

5. The proposed paper and pulp mill site of 1,200 acres, which was the sole focus of the valuation testimony presented at the trial, is located on the old "McCalla" home site which is the most level piece of ground on the entire property. The site which is on the border of Georgia and South Carolina has access to the Savannah River for its water supply and effluent discharge. The credible valuation testimony for the 1,200 acre site does not include any additional value for timber. Mead purchased the 1,200 acres for a pulp and paper mill site. Mead spent considerable sums for engineering studies of a pulp and paper mill operation on the subject tract; the mill was never built primarily because of the pending Russell Dam/Trotter Shoals Project and also because of then existing market conditions and the ready availability of other sites to Mead.

6. The 1970's progressed, the availability of good pulp and paper mill sites in the Southeast steadily diminished due to: (a) other paper companies acquiring sites; (b) federal water projects interfering with free running rivers; and (c) the advent of state and federal environmental regulations. On May 12, 1977, the number of good Southeastern pulp and paper mill sites was extremely limited and competition for such sites was active and intense. Consulting Engineer Carlton T. Wise, a Clemson graduate in Civil Engineering, who was with Bethlehem Steel Corporation for some years, later with one of South Carolina's most reputable engineering firms for forty (40) years, and who related experience with various major paper companies, told of air exhaustive review of the site along with Daniel Construction Company, as to the suitability/desirability of the site, con-

firmed that the site was intended as a mill site.

7. This court has carefully considered the factors which various witnesses stated were important in the location of a paper mill of the kind contemplated in this case, they include

LAND: The land must be such as to[1] support a paper mill which is usually spread over a site of 800–1200 acres because of the spread of mills/improvements. It must be land near suitable raw water, of adequate flow. It must have a soil base adequate to support roads/rail ways for ingress/egress for supplies in products out. The undisputed testimony of Engineer Wise indicates that borings were taken and the soil near the surface was not suitable for soil bearing, but that 3 to 5 feet below the surface had soil suitable for heavy loads. The location of the site will be discussed later.

WATER: It is undisputed that a paper mill, such as the one contemplated, needs an adequate raw water supply. The testimony showed that the Savannah River was adequate (the paper mill would need a maximum of 30 million gallons per day but a raw water storage of week/10 day supply was recommended–raw water storage is normal in paper mills). The water quality of the supply at the mill site is Class A (suitable for swimming) by S. C. Standards.[2] The water flow is 1350 cubic feet/sec. In addition to the water flow for intake purposes, the flow must be sufficient to absorb the effluent discharged by the paper mill and the testimony revealed[3] that the effluent assimilation and the PH factor

requirements would be met downstream. Testimony compared a paper mill approved at Dublin, Georgia, on the Oconee River, where the flow is forty (40%) per cent less than the Savannah at Mead site[4], and a paper mill near Bennettsville, South Carolina, which discharges into the Great Pee Dee River and which has less flow than the Savannah.[5]

SOURCE OF TIMBER: Availability of timber supply is critical to location of a paper mill. Prices vary as much as 50% between areas. Undisputed testimony[6] revealed that supply, cost, availability and growth rate are important. The 18 county area surrounding Calhoun Falls, South Carolina (4–6 miles downstream) is among the best timber source area in South Carolina. The growth rate is "record high in the South East." The supply is good and continuous because in 1977 only 52% of available supply of pine growth was in process of being harvested. Within 150 mile radius of the mill site 1,036,000 cords are available to Mead, which would need only 33% of the supply. The area had the lowest stumpage costs in the Southeast–in May, 1977 pulpwood at Calhoun Falls brought $8.88/cord stumpage, at the same time bringing $14.63 in the Great Pee Dee Area, $15.00/cord near Dublin, Georgia. There was no contest to testimony[7] that the Calhoun Falls site was other than desirable. Dr. Charles Carpenter, a credible witness for defendant, reiterated the need for the availability of wood supply–the total resource within economic reach of the mill–which can be bought from the owners.[8] The raw materi-

---

1. It is not disputed that the consideration was a 800–1200 ton/day dry bleached–type paper mill [testimony witness Manning and others].

2. Testimony of Timothy J. Doyle, consulting Engineer of Davis, Jones and Moore of Atlanta, Georgia.

3. Ibid.

4. Ibid.

5. Ibid. The government's star witness (Griffith) did not take into consideration the cost of treating the effluent. In fact, his report and testimony showed no credible knowledge of the necessity of adequate raw water.

6. The testimony of William Tichmor, who prior to employment by Mead in 1977 as corporate director of Woodlands (BA Harvard, Morton Forestry, Yale) was with Scott Paper Co. & Hudson Paper Co., detailed wood sources, etc.

7. Ibid.

8. Government Expert Griffith admitted he had never participated in the purchase of a site for a paper mill. Carpenter testified he had spent 60% of his time over the last 15 years selecting paper mill sites. Griffith did not take into consideration the cost of timber.

al estimates for the site were based on production of 1000 tons of productivity *per day*.[9]

*TRANSPORTATION*: Despite the dispute as to transportation facilities this court is convinced transportation facilities are adequate. Of course, they are essential. Pulp wood is shipped by rail and truck. The property has two (2) rail accesses, one 5–6 miles South and another 2–2½ miles East. To reach one railroad would require a bridge across a creek on/adjacent to the property, but when one takes into consideration the undisputed testimony that the rail/truck potentials are adequate, and reviews the comparisons, transportation is no problem. Recognizing the difficulty of the necessity of a bridge over Rocky Creek, the court has uncontradicted evidence the car loadings in and out would approximate two hundred (200)[10] per day (what railroad would refuse to build a spur track to accommodate such a volume of business?) When questioned about this one witness[11] testified on cross–examination that he knew of no instance in which a paper mill was refused a spur track. It appears the transportation problem, insofar as rail facilities are concerned, has a ready, acceptable solution if a problem exists. The two rail accesses, one South 5–6 miles and one East 2–2½ miles, appear more than adequate.

In considering transportation one cannot ignore the impact of the trucking industry on American industrial transportation. This court has discussed the soil borings that support ingress and egress to the proposed plant, and onto the property. Three Interstate highways are within a reasonable distance, I–85, I–26, and I–20. South Carolina State Highway 81 is within a short distance. Testimony (uncontradicted) indicated fourteen/fifteen truck lines serve Calhoun Falls, some 3–5 miles from the plant site. The court will take judicial notice of the magnificent co–operation of the South Carolina Highway (transportation) Department in the States' industrial growth and development. Uncontradicted testimony was offered that secondary roads would carry the load capacity of the mill.

*SURROUNDING CIVILIZATION*: The benefits/problems with surrounding civilization are of great importance in site selection. In addition to proximity to timber supply, a buffer zone must be considered to secure the environment around a plant site.[12] Generally speaking a manufacturer installing a paper mill would choose an isolated spot.[13] At the same time housing and cultural facilities for plant employees must be considered. The site is commuter–close to Calhoun Falls, South Carolina, Anderson, South Carolina, and Elberton, Georgia. The air pollution problem does not appear paramount in any sense,[14] because of the distance from surrounding towns and cities. The environmental problem with clean air is met and satisfied by this factor.

*ENERGY*: A paper mill, or comparative industrial plant, must consider available energy sources when plant construction/location is surveyed. The area is served by Duke Power Company whose rates and supply capabilities compare with others in the Southeast. A gas pipe line exists within 2½ miles of plant site and the site is as near the great coal fields of West Virginia as any other comparable plant or plant site in the Southeast. Uncontradicted testimony was offered, that kilowatt hours from Duke

---

9. Testimony of Werne Gruenwald, Mead Manager Engineering and Projects.

10. Testimony of Werne Gruenwald.

11. Carlton T. Wise, retired engineering executive, whose company had a 50% business volume in pulp and paper mills.

12. Is it irrelevant here to note that paper mills stink, downwind? Fortunately the prevailing wind in that section of the state is Southeasterly so Calhoun Falls will be spared offensive odors. No protest from local citizens has been noticed.

13. Testimony of C. T. Wise. When the court visited sites at Dublin, Georgia, and along the Great Pee Dee River, the sites were isolated from nearby towns, Dublin being about four (4) miles West of the mill there.

14. Testimony of Timothy J. Doyle, Civil Engineer, of Davis, James and Moore, Atlanta, Georgia.

could be obtained at considerably less per hour than at other sites in the state, which would place Mead in a fortunate competitive position with Boise Cascade Corporation and mills using Carolina Power Light energy along the Great Pee Dee, etc.[15] It appears the site under construction here has desirable energy probabilities.

*WATER USE AND DISCHARGE*: It is obvious from the discussion here that a paper mill uses an unusual amount of raw water, discharges a comparative effluent. The government contended the water supply is inadequate and the effluent cannot be successfully handled because Calhoun Falls water intake is within five (5) miles of the proposed plant discharge and Hickory Knob State Park is located on the Clark's Hill Reservoir about 24 miles downstream.

There is no question but that the Savannah, at the site of the contemplated plant, has a regulated flow. It was early determined by defendant that there was a need for a raw water storage supply of a week–10 day capacity, which, in addition to assuring adequate water would allow for settlement of turbidity.[16] Raw water storage is normal to paper mills.[17] The topography of the site is suitable because of the sloping terrain.[18] The water supply, of course, affects intake of water used in the manufacturing process and egress of water carrying the effluent. Consulting Engineer Doyle resulted in his conclusion that the oxygen numerical standards and the PH factor requirements would be met. He told of consultation with South Carolina officials and the building of a model to test the site conditions and a funding that preventive measures could be provided, including possible color and suspended solids treatment. He opined that the South Carolina Depart-

ment of Health and Environmental Control would issue a permit for the construction of the plant.

A candid, credible, head–on to the water effluent problem was displayed to the court by Werne Gruenwald,[19] who testified that the contemplated cost (in 1977) of the paper mill,[20] and that in the estimated cost of $450 million for the mill the amount of $800,000 to move the intake pipe for the town of Calhoun Falls to a point above the effluent. On direct examination he stated that the water intake and effluent problems were problems but had been considered and a possible $2,000,000 was budgeted for color–reduction and other effluent problems. It affirmatively appears that if the mill had been constructed as planned, any water problems would have been adequately conquered.

*OTHER FACTORS*: Other factors which appear on the periphery of consideration are those such as a buffer zone, adequate here because of location; the local tax situation which was not discussed in this court so is apparently not a factor; cost of distribution to market which posed no apparent problem before this court as such was not discussed. The court must assume that if any such factors were negative, the court would have been advised.

8. It is obvious that there was sharp conflict in the testimony, and the court, as a finder of fact, has to sift for the thread of truth. The government contends that the government witness Griffith was infallible because he is a real estate appraiser and that defense witness Carpenter is not credible because he is not a real estate agent or appraiser. This court could not escape the fact that *all parties agreed* that the *best use* of the tract was/is for a *paper mill site.*

---

15. Government "expert" Griffith never touched on this facet of paper production, or mill site desirability, but rather admitted he "did not know what a paper mill wanted in a site".

16. Testimony of Wise.

17. Ibid.

18. Earth is "borrowed" from the higher elevation, thus providing a collection area, and used

for the dam at the lower side–a common practice in pond construction.

19. See Footnote 9, *supra.*

20. A 1000 ton/day mill–in 1967 the production estimate was only 360 tons/day, but the feasibility was raised to 1000 tons because of raw material supply.

Griffith testified he had never participated in the purchase of a paper mill site, did not know what a paper mill wanted in a site, had no experience in engineering procedures, did not consider the price differential in timber raw material as significant, had no idea of cost of treating the effluent, no idea of cost of moving Calhoun Falls intake upstream, had no idea of comparable energy costs, etc.–he did not refute the necessity of such considerations in erecting a paper mill. This court has called him the government "expert" because the government relied on him despite his lack of familiarity with the kind of mill contemplated. Carpenter, with a forestry background had his first job at Carnege Institute doing research in cellulose, later was chief chemist for the Hurty Foundation hired to find uses for pine raw materials, where mechanized pulp was first developed from pine. In 1939 he became technical director for a Texas group, and put pine paper pulp into production in 1940, was General Superintendant of the first plant until 1947, when he left to go with Curtis Paper Company, later with others. Since 1952 he has spent considerable amount of time searching for and evaluating sites for pulp and paper mills. This court finds his testimony knowledgeable, detailed and dependable.

9. Much of the testimony revolved around a comparison of plant sites. Defendant's witnesses explained the knowledge of the needs far better than that of the government. Defense witnesses showed familiarity with the site in question as far back as 1966 when it was compared with four other locations. This court considered the testimony and finds as a fact, from the testimony, exhibits, and personal observation that the site under consideration is a far better site than that of Dublin, Georgia or those on the Great Pee Dee.

The testimony as to other sites, not viewed by the court in the helicopter observation, was considered, also. The court has considered:

(a) Boise Cascade Corporation, Marion County, South Carolina; 1,117.86 acres of this site are comparable to the subject tract;

(b) Boise Cascade, Marlboro County, South Carolina; 995.63 acres of this site are comparable to the subject tract;

(c) Carolina Kraft, Marlboro County, South Carolina; 339.2 acres of this site are comparable to the subject tract;

(d) South East Paper Manufacturing Company, Laurens County, Georgia; 1,003.79 acres of this site are

(c) Carolina Kraft, Marlboro County, South Carolina, $1,303.00 per acre;

(d) South East Paper Manufacturing Company, Laurens County, Georgia, $1,193.00 per acre;

(e) Georgia Pacific Corporation, Halifax County, North Carolina, $1,464.00 per acre.

Than in order to determine a more representative value for the subject tract, this court should not consider the highest and lowest extremes of prices of the above comparable sites, and therefore the values of the Boise Cascade, Marlboro County site and the Georgia Pacific, Halifax County site should be eliminated in computing the value of the subject tract; that the average price per acre of the comparable acreage of the remaining comparable sites was $1,252.00 per acre as of May 12, 1977.

## CONCLUSIONS OF LAW

■ A. The court has jurisdiction over the subject matter and the parties to this suit in accordance with 28 U.S.C. § 1358,[21] and Rule 71A(h)[22] of the Federal Rules of

---

21. U.S.C. § 1358 provides: Eminent domain.
   The district courts shall have original jurisdiction of all proceedings to condemn real estate for the use of the United States or its departments or agencies.

22. Rule 71A(h) Federal Rules of Civil Procedure provides:

(h) Trial. If the action involves the exercise of the power of eminent domain under the law of the United States, any tribunal specially constituted by an Act of Congress governing the case for the trial of the issue of just compensation shall be the tribunal for the determination of that issue; but if there is no such specially constituted tribunal any party may have a trial by jury of the issue of just compensation by

Civil Procedure. All parties agree that the defendants are the fee simple title owners of the property being acquired. Once the ownership interests of the defendants have been determined, it is then necessary to look at federal law which governs all procedural and most substantive matters arising in a federal condemnation proceeding. *United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943); Rule 71A, Federal Rules of Civil Procedure.

■ B. It is well established that the burden of proving the value of the condemned lands rests upon the condemnee. *United States ex. rel. T.V.A. v. Powelson*, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943); *Welch v. Tennessee Valley Authority*, 108 F.2d 95 (6th Cir. 1939) cert. denied, 309 U.S. 688, 60 S.Ct. 889, 84 L.Ed. 1030 (1940); 5 Nichols on Eminent Domain § 18.5 (3rd Ed. Rev. 1975). Therefore, where the evidence presented by the landowner is equal to or less persuasive than that presented by the condemnee, the landowner has failed to carry its burden. It is equally clear that the standard upon which compensation is based is "market value", what it fairly may be believed that a purchaser in fair market conditions would have given. *United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943). "Fair market value" has also been defined as that amount of money that a knowledgeable purchaser willing, but not obligated to buy the property, would pay to a knowledgeable owner willing, but not obligated to sell it, taking into consideration all uses to which the land was adopted or might within reason be applied. *Transwestern Pipeline Company v. O'Brien*, 418 F.2d 15 (5th Cir. 1969). In effect, the defendants are entitled to be put in as good a position pecuniarily as if their property had not been taken. *Olsen v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1943). All appraisers have chosen the market data approach by using comparable sales in arriving at their respective valuation opinions of the subject property. It is well established that the best evidence of value is a voluntary, arms–length, cash sale in the open market of the property in question, and which is reasonably near in time to the date of taking. *United States v. 1,129.75 Acres of Land, Etc.*, 472 F.2d 996 (8th Cir. 1973).

■ C. In arriving at an opinion of fair market value, care must be taken to exclude any increment of value of the property taken which is personal to the owner.[23] *United States v. Petty Motor Co.*, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946). The Fifth Amendment requires that "only that 'value' need be considered which is attached to property" i. e., "transferable value." "In view, however, of the liability of all property to condemnation for the common good, loss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of the police power, is property treated as part of the burden of common citizenship." *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5, 69 S.Ct. 1434, 1437, 93 L.Ed. 1765 (1949).

■ Since 'market value' does not fluctuate with the needs of the condemnor or the condemnee, but with general demand for the property, evidence of loss of profits, damage to good will, lost business opportunities, the expense of relocation and other consequential losses are not allowed in fed-

---

filing a demand therefor within the time allowed for answer or within such further time as the court may fix, unless the court in its discretion orders that, because of the character, location, or quantity of the property to be condemned, or for other reasons in the interest of justice, the issue of compensation shall be determined by a commission of three persons appointed by it. If a commission is appointed it shall have the powers of a master provided in subdivision (c) of Rule 53 and proceedings before it shall be governed by the provisions of paragraphs (1) and (2) of Subdivision (d) of Rule 53. Its action and report shall be determined by a majority and its findings and report shall have the effect, and be dealt with by the court in accordance with the practice, prescribed in paragraph (2) of subdivision (e) of Rule 53. Trial of all issues shall otherwise be by the court.

**23.** This court has allowed no testimony as to such increment, and none such is considered.

eral condemnation proceedings.[24] *Mitchell v. United States*, 267 U.S. 341, 344, 45 S.Ct. 293, 294, 69 L.Ed. 644 (1925); *United States ex. rel. T.V.A. v. Powelson*, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943). Furthermore, the loss of supply business customers, good will, or special business site value as a result of the taking cannot be considered.[25] *Mitchell v. United States*, 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644 (1925). In *Mitchell*, the condemnor acquired property which had been used for growing a special grade of corn for Mitchell's Cannery. It could not move elsewhere but the court rejected a claim for compensation stating "If the business was destroyed, the destruction was an unintended incident of the taking of the land." Id. at 345, 45 S.Ct. at 294.

D. Of necessity, this court has had to rely on expert, or learned testimony. Plaintiff insists its experts are infallible, the defendant's not qualified. The court does not agree.

■ Mead's principal valuation witness was Dr. Charles Carpenter, a forester whose entire adult life has been devoted to the pulp and paper industry. He testified that for more than thirty years he has spent a majority of his time in site selection work for major pulp and paper companies in the United States and Canada. These activities not only involved an assessment of the suitability of a site for pulp and paper operation (e. g., pulpwood availability, environmental concerns, site engineering, etc.), but also required that he become familiar with the fair market values of pulp and paper mill sites throughout the country and particularly the Southeast. He testified that on many occasions he participated in assembling the real estate for the paper company and even served as the company's contact man for the actual landowners. Carpenter freely admitted that he was not a real estate appraiser in the strict sense of the word; however, he believed that his many years of experience in evaluating and valuing pulp and paper mill sites enabled him to form an intelligent opinion regarding the fair market value of the condemned property which is the subject of this action. His testimony was informal and informative. A witness' unfamiliarity with the technicalities of testimony pertaining to value in a federal condemnation case does not disqualify him from giving a competent opinion as to value where he otherwise shows such background, training, and experience as would make him knowledgable of the valuation issues before the Court. *United States v. 79.39 Acres of Land in Breckinridge and Meade Counties, Kentucky*, 440 F.2d 1190 (6th Cir., 1971). Likewise, such a person need not be a realtor or a real estate salesman in order to qualify as an expert on real property value. *Morton Butler Timber Co. v. United States*, 91 F.2d 884 (6th Cir., 1937); *United States v. 1040.30 Acres of Land, Etc.*, 144 F.Supp. 199 (W.D.La., 1937).

The uncontradicted testimony of John Dues, a real estate manager of The Mead Corporation, was that in his experience neither The Mead Corporation nor any other paper company customarily relied on general real estate appraisers (MAI or otherwise) to ascertain for them the dollar value of a paper mill site. Such value, he said, is inextricably bound up with technical and manufacturing considerations and can be realistically determined only by someone such as Dr. Carpenter who by experience is familiar with the market values of other comparable sites and has personal expertise in the industry's manufacturing processes.

■ Dues' opinion is in harmony with the legal principle that market value for condemnation purposes is not a quality inherent in the property itself, but rather is a reflection of the state of mind of the public with respect to the property, and such state of mind may be established by expert witnesses qualified by their special knowledge to give an opinion as to what he believes it to be or by evidence of transactions involving comparable property from which the fact finder may deduce the market value of the subject tract. *United States v. Smith,*

24. Ibid.

25. Ibid.

355 F.2d 807 (5th Cir., 1966).[26] In this present case, both parties have stipulated that the highest and best use of the 1,200 acres at issue is that a pulp and paper mill site. As a result of such stipulation, the only logical purchaser of the site would be a pulp and paper company. This being the case, it is apparent that only a witness with Dr. Carpenter's experience (rather than a general MAI appraiser who has no special knowledge of pulp and paper mill sites and who had never appraised such a site before he was employed by the Plaintiff) is truly qualified to know the "state of mind" of the paper industry regarding the market value of mill sites.

■■■ As fact finder this court has determined the credibility of the expert witnesses and the weight to be accorded any testimony. *United States v. 1061.14 Acres of Land, Stutsman City, N. D.*, 491 F.2d 700 (8th Cir., 1974). The responsibility for determination of comparability of real estate sales and the weight to be given evidence of comparable sales also rests on the shoulders of the fact finder. *United States v. 124.84 Acres of Land, Warrick County, Ind.*, 387 F.2d 912 (7th Cir., 1968); *United States v. Lowrie*, 246 F.2d 472 (4th Cir., 1957).

E. The court notes that in various tracts Carpenter referred to options and to deeds which later were signed after the options were executed. Except in one case (Southeastern Paper Manufacturing Co., Dublin, Ga.) the date an option was exercised is unknown. In that consideration Dr. Carpenter stated that the exercise date would have to be assumed to be the deed date since that necessarily is the latest date the particular option could have been exercised.

In many of the comparable sales he used the option date as the date from which the land price was adjusted upward or downward so as to arrive at a price opinion for May, 1977, which is the date the subject property was condemned. The government objected to this manner of adjustment on the basis that evidence of fair market value cannot be determined from an unexercised option; however, in each and every option situation used by Dr. Carpenter, the particular option *was exercised* by the paper company and a deed later was conveyed pursuant to the option's terms and provisions. The sole issue, therefore, is what date should be used in adjusting the sales price to May, 1977; that is, is it proper to use the date the exercised option was first entered into and the parties' minds met as to price, or as the plaintiff would contend is it proper only to use the deed date as the baseline for adjustment regardless of the fact that the land's value was determined in the first instance by the option and later was merely reflected in the resulting deed.

■■■ When an option is exercised and results in a binding agreement between buyer and seller, its probative value as to fair market value is equivalent to a completed conveyance regardless of whether the purchase price has been paid or the deed transferred. *United States v. Smith*, 355 F.2d 807 (5th Cir., 1966). Since the referenced options in all cases were exercised, Carpenter's testimony as to options was both proper and competent to establish value for the comparable tracts. As noted in *Smith*, an exercised option is as fully probative as a deed. In the case of an exercised option, it therefore is logical and reasonable to consider the option signing date as effectively determining the value of the land in the minds of buyer and seller. To consider only the deed, which may be conveyed several years after the option is purchased by the buyer, ignores the fact that the deed price merely relates back to the original purchase price set in the option.

In *United States v. 297.49 Acres of Land, Etc.*, 308 F.2d 641 (4th Cir., 1962), it was established that even an unexercised option has probative value where it was given by the landowner to the government and thus was an admission of value as to the land

---

**26.** As Mr. Justice Holmes stated in *Boston Chamber of Commerce v. Boston*, 217 U.S. 189, 195, 30 S.Ct. 459, 460, 54 L.Ed. 725 "The Constitution * * * merely requires that an owner of property taken should be paid for what is taken from him * * * [a]nd the question is, what has the owner lost, not what has the taker gained?"

itself. In that case the owner on March 29, 1956, granted the United States an option to purchase the land which later became the subject of a condemnation action. The option was renewed on October 26, 1956. The Fourth Circuit held that the purchase price of the land as set forth in the option was admissible as evidence of value; however, the Court expressly stated that the jury should be instructed to consider the option only as evidence of the land's value in March and October of 1956 and to take into account any increase in value from those dates until 1958 when the notice of taking was filed. Thus the Court implicitly recognized the validity of adjusting the price forward from the original option date to the date of taking. Since both that case and the case at bar involved facts which endowed the respective options with probative value, this court finds such an evaluation has been accepted in principle by this Circuit and should be allowed.

■ Another objection raised by the government during trial was that Dr. Carpenter acted improperly when he testified to a comparable sale (Boise Cascade, Marion County, South Carolina) in which the deeds were transferred in 1978. Such objection ignores the fact that the options were taken in 1977 and in any event assumes that 1978 land values are not probative of values one year earlier. This assumption is patently absurd absent a showing that there occurred an abnormal price inflation during that year, and such a showing was not even attempted by the plaintiff. Moreover, this defendant would note that Mr. Marion Griffith, the government's appraiser, himself used 1978 and 1979 sales in evaluating the Boise Cascade, Marlboro County, South Carolina, comparable site. Under such circumstances the Plaintiff's objection as to Dr. Carpenter's usage rings hollow and is without merit.

■ F. This court finds as a fact and concludes as a matter of fact and law that the value of Mead's subject tract of 1,200 acres, as of May 12, 1977 as $1,502,400.00 ($1,252.00 per acre), based on the best measure of the value of comparable pulp and paper mill sites as computed and determined by the court from the credible testimony. [In so ruling this court relied not only on the conclusions of Dr. Carpenter, but upon its own actual inspection of the subject site by helicopter as well as taking into consideration all the testimony as to the relative merits of the subject site as compared to the other sites listed above.]

G. Mead, by the preponderance of credible evidence, has shown that as of May 12, 1977, the subject site was suitable for the operation of a pulp and paper mill and was substantially equivalent, and in most cases superior, to the comparable sites reviewed by the court.

H. Pursuant to 40 U.S.C. § 258a, judgment in favor of The Mead Corporation should be entered in the amount of $1,105,-828.50, which sum is the difference between the value of the 1,200 acres at $1,252.00 per acre and the estimated compensation of $396,571.50 previously paid by the United States of America, together with interest of 6% per annum on said difference computed from the date of taking.

### ORDER

The Clerk will enter judgment for defendant in the amount of $1,105,828.50.

AND IT IS SO ORDERED.