918 F.2d 956
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James Steven McCLURE, Defendant-Appellant.
 No. 90-5001.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 5, 1990.
Decided Nov. 21, 1990.
 
 Appeal from the United States District Court for the Western District of North Carolina, at Bryson City. Richard L. Voorhees, District Judge. (CR-89-41-B).
 Stephen P. Lindsay, Moore, Lindsay & True, Asheville, N.C., (argued) for appellant; Ronald C. True, Moore, Lindsay & True, Asheville, N.C., on brief.
 Thomas Richard Ascik, Assistant United States Attorney, Asheville, N.C., (argued) for appellee; Thomas J. Ashcraft, United States Attorney, Jerry W. Miller, Assistant United States Attorney, Asheville, N.C., on brief.
 W.D.N.C.
 AFFIRMED.
 Before K.K. HALL and MURNAGHAN, Circuit Judges, and STAMP, United States District Judge for the Northern District of West Virginia, Sitting by Designation.
 PER CURIAM:
 
 
 1
 James McClure's appeal from a conviction of conspiracy to rob a bank turns on the existence vel non of a videotape. While investigating testimony that a man, allegedly McClure, had scouted out the bank in preparation for a robbery, an FBI agent viewed the bank surveillance tape of the alleged day. After finding the videotape picture blurred and out of focus, the FBI agent left the tape at the bank. When defendant McClure requested the tape, the government's reply implied that the tape was in government files. Defendant thereafter learned of the bank's custody, only to find that the bank had retaped or erased the contested footage. At trial, the bank teller who claimed McClure had scouted out the bank testified to having viewed the videotape. In several motions prior to the trial and after close of evidence, McClure unsuccessfully argued, and now appeals on the grounds, that the government's actions in giving misleading information as to the whereabouts of the videotape denied him a fair trial.
 
 
 2
 McClure asserts that the government's failure to comply accurately with discovery denied him a fair trial under the Fifth Amendment. In specific, McClure's appeal poses the following questions:
 
 
 3
 1. Was there error in the government's failure to notify McClure about perjured or impeached testimony at trial? If so, did the government's action violate his constitutional right to a fair trial?
 
 
 4
 2. Did the district court judge err in his denial of McClure's motions to dismiss because either
 
 
 5
 a. the government failed to preserve videotaped evidence despite agent testimony that customers could not be distinguished on the tape; or
 
 
 6
 b. the government failed promptly to disclose the correct location of the videotape?
 
 
 7
 We conclude that the district court's repeated findings that the videotape was not Brady material probably survive scrutiny, but, even in the event of a finding to the contrary, the failure to notify of the teller's testimony, to take possession of the tape, or to disclose immediately to McClure its location, although perhaps regrettable, does not establish a violation of McClure's constitutional rights under the analysis developed from Brady v. Maryland, 373 U.S. 83 (1963).
 
 
 8
 In the fall of 1988, McClure and several others allegedly discussed robbing a bank in Hayesville, North Carolina. McClure claimed that he had "no intention of going through with the bank robbery" and only continued discussions to "pacify" other conspirators. The bank robbery conspiracy apparently became known to the government after McClure's and others' attempts to rob a convenience store failed. (The owner took the gun from one of the robbers, shot the robber, and then punctured the gas tank of the "getaway" car as the others attempted to flee.) Although defense counsel succeeded in showing inconsistencies in the coconspirators' testimony implicating McClure, the jury, nevertheless, found him guilty. He received a sentence of forty-three months imprisonment.
 
 
 9
 The case before the court has little to do with the robbery; rather, it focuses on a mysterious bank surveillance videotape. After learning of the proposed robbery, FBI agent U.K. Miller went to the bank to investigate allegations that McClure had entered the bank to check out the interior. Miller testified that on the visit in September or October 1988 he viewed the bank's surveillance tape of the day in question. Finding it fuzzy and out of focus, with only the backs of the tellers' heads discernible, however, he left it with the bank. Some time prior to May or June 1989 the bank erased or retaped over the tape. The record does not disclose when, in fact, the contested footage disappeared. The motion by McClure of July 18, 1989, stated that the bank president told counsel "that the bank surveillance tape had been erased or taped over by their office after the FBI told them it would not be needed for evidence." McClure has argued that the court should assume that the footage existed "up to approximately ten days prior to the date the Government finally informed defendant of its whereabouts...."
 
 
 10
 The grand jury indicted McClure on April 4, 1989. On May 3, his counsel submitted motions for general discovery and specific discovery of the tape to the court. The specific motion requested a
 
 
 11
 [v]ideotape ... in the possession of the Government, its agents and/or the bank alleged to ... depict the individual ... entering said bank to "looking [sic] over the interior of said bank." The government's file indicates that witnesses in the bank identified the defendant and the evidence sought is believed to be exculpatory in nature....
 
 
 12
 On May 15, the court ordered the production of all Brady material and the preservation of all arguably Brady material, but denied the specific motion in light of the government's open file policy. On June 7, McClure submitted a motion to compel disclosure of the videotape, noting that government files did not contain the tape and that he believed it to be Brady material. In response, on June 13, the government made a statement of questionable accuracy as to the videotape's existence: "Videotape footage exists of defendant's alleged entry ..., however, because of the poor quality of the videotape, the United States has obtained no evidence from said videotape and does not plan to use said videotape as evidence in this matter." McClure renewed his request on June 13.
 
 
 13
 On June 26, the court magistrate ordered the government to produce the tape. Earlier that morning, however, the government had submitted a further response stating that it did not possess the videotape. On those grounds, on June 30, the government asked the magistrate to reconsider its order. On July 5, the magistrate modified the order compelling the government to produce the tape on the grounds that the government did not possess the tape and, in addition, the tape was not exculpatory and hence not discoverable under Brady.
 
 
 14
 The defendant brought a motion to dismiss claiming that the government's actions in failing timely to inform the defendant of the location or preserve the material violated the magistrate's order and his constitutional rights. At the hearing, Agent Miller testified that no one except the tellers could be discerned on the tape. He also stated that he gave no orders regarding the disposition of the tape. The court found that the evidence was not Brady material because the government did not possess the tape (reviewing the evidence had not amounted to taking possession) and that Miller's testimony suggested that the poor quality of the tape made it nonexculpatory. The court thereupon denied the motion to dismiss.
 
 
 15
 At the ensuing trial, the head teller identified McClure as the man who had entered the bank. She said she had seen him previously in photographs presented by the FBI agent and on the videotape. The government impeached her testimony with Agent Miller's testimony that a viewer of the tape could not have identified any customer. The government even elicited Miller's statement that, when the teller had been shown photographs, "she could not be certain as to either individual being in the bank. That--just that they appeared familiar to her." (She had testified that she had been absolutely sure of her identification.) Defense counsel also used Agent Miller's testimony to discount the statements of coconspirators regarding McClure's involvement.
 
 
 16
 Prior to the jury verdict, McClure reasserted his argument to dismiss the case because of the problems with the videotape. The district court judge denied the motion for directed verdict, although noting he had some concern about "the handling of the tape."
 
 
 17
 McClure has claimed that the tape existed in June. Had McClure been told of the tape's existence, he could have used it to impeach the teller. He argues that the government should have known that the teller would testify that she had seen the videotape. Moreover, the government had a duty so to advise McClure to enable him to prepare to attack her credibility. In addition, McClure renews his arguments that the government failed to preserve the tape, arguing that it is irrelevant whether the government's failure was negligent or deliberate because the prosecutor had a duty to disclose evidence under the magistrate's orders. McClure originally asked for dismissal of the indictment or a new trial; however, in the reply brief he also has requested, in the alternative, a remand for an evidentiary hearing on when the videotape was erased.
 
 
 18
 The government argues that the appeal involves merely a review of the district court's findings that the videotape was not Brady material and, in any case, the actions with the videotape do not establish government impropriety.
 
 
 19
 Our analysis focuses upon Brady because other rules governing discovery, the Federal Rules of Criminal Procedure, do not appear to add responsibilities to the government applicable in the case beyond those required by Brady. For example, "Rule 16(a)(1)(C) 'triggers the government's disclosure obligation only with respect to documents within the federal government's actual possession, custody, or control." United States v. Pinto, 905 F.2d 47, 50 (4th Cir.1990) (quoting United States v. Gatto, 763 F.2d 1040, 1048 (9th Cir.1985)).
 
 
 20
 McClure's arguments derive from the Brady line of cases. First, McClure has argued that the government did not notify him that "one of the government witnesses would give testimony inconsistent with prior representations of the government...." Second, McClure has argued that the government did not preserve the evidence: first, by leaving it in the bank's possession; second, by failing to inform the defense of its location.
 
 
 21
 The rule established by United States v. Brady, 373 U.S. 83 (1963), molds "the area of constitutionally guaranteed access to evidence." Arizona v. Youngblood, 488 U.S. 51 (1988) (quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982)). In recent years, the Brady rule has undergone refinements to clarify the circumstances under which prosecutors' actions concerning evidence deny defendants' constitutional rights.
 
 
 22
 The Supreme Court traditionally recognized three situations to which Brady issues applied. First, the prosecutor either made knowing use of perjured testimony or failed to disclose that testimony used to convict the defendant was false. In such a case, the conviction had to be set aside if there was "any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Bagley, 473 U.S. 667, 678 (1984) (quoting United States v. Agurs, 427 U.S. 91, 103 (1976)). Second, Brady applied where the defense made a specific request for evidence or, third, a general request for evidence. In Bagley, the Court held that "no request," "specific request," and "general request" cases should be addressed by the same materiality standard: "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 473 U.S. at 682.
 
 
 23
 The standard, however, appears to differ when "we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Youngblood, 488 U.S. at 57. In Youngblood, the Supreme Court, in an opinion written by Chief Justice Rehnquist, held "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id. at 58. The case involved the police's failure to refrigerate clothing taken as evidence in a sexual assault on a ten-year-old boy.[1] Justice Stevens in his concurrence criticized the holding as overly broad, preferring to find that the police had as great an interest in preserving the evidence as the defendant, the lost evidence was probably immaterial, and its absence did not prejudice the case. Justices Blackmun, Brennan, and Marshall dissented. Justice Blackmun found no reason for a bad faith requirement in "preservation" cases and a materiality test in "suppression" cases. He would have had the court "focus on the type of evidence, the possibility it might prove exculpatory, and the existence of other evidence going to the same point in contention...." Id. at 69.
 
 
 24
 Constrained by such authority, McClure has argued under traditional Brady analysis that the government should have known the teller would testify about the videotape. Her statement that she had seen the videotape created "perjured" testimony--either her own or that of Agent Miller. McClure claims that he "was surprised to his prejudice" by her testimony and concludes that the government impeached her testimony only to preserve the appellate record.
 
 
 25
 Assuming that the defendant, in the absence of preserving the point, could raise the perjured testimony claim, it is extremely dubious that the facts lead to the conclusion that the government "knew or should have known" that the testimony was perjured. "Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." United States v. Griley, 814 F.2d 967, 971 (4th Cir.1987).
 
 
 26
 Even if the court should have found that the government should have known the testimony was perjured, the error is harmless unless "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury." Boone v. Paderick, 541 F.2d 447 (4th Cir.1976), cert. denied, 430 U.S. 959 (1977) (quoting Giglio v. United States, 405 U.S. 150, 154 (1972)). The teller's allegedly false testimony does not appear to have affected the jury. The government promptly impeached the teller's testimony. All in all, there has been no error of reversible proportion by the district court in handling the perjured testimony claim.
 
 
 27
 The failure to preserve evidence assertion comes within issues raised in Youngblood. The district court order stated:
 
 
 28
 2. That the government disclose all Brady material which is in the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence should become known, to the attorney for the government. Disclosure under this paragraph will include the following:
 
 
 29
 * * *
 
 
 30
 * * *
 
 
 31
 A. Evidence or information specifically requested by defendant which is favorable to the accused and "material either to the guilt or to punishment." ...
 
 
 32
 * * *
 
 
 33
 * * *
 
 
 34
 11. That the government shall preserve all evidence or records arguably subject to disclosure under any of the Federal Rules of Criminal Procedure or under Brady and its progeny....
 
 
 35
 The defendant appears now to have shifted his argument about the videotape from the government's failure to turn over evidence[2] to the government's failure to take steps to preserve the evidence. First, Miller did not confiscate the tape at the bank as he should have. Second, upon receiving the initial motion to compel, the government did not tell the defendant that the tape had not been removed from the bank.
 
 
 36
 The government has relied on the not-clearly-erroneous aspects of the district court's findings of fact. In addition, the government has sought to refute what it terms "allegations of government misconduct" by offering a benign "apologetic" account of the proceedings. The government contends that Miller's decision not to take possession of the tape, while in hindsight perhaps regrettable, does not show bad faith and a failure to preserve. The Assistant United States Attorney's actions during discovery were also appropriate. Accepting that the government did not have the videotape, the initial discovery request did not require any response indicating the tape's location. The answer to the motion to compel did incorrectly refer to the "existence" of the tape; however, it also argued that the tape was not Brady material as it was nonexculpatory and not going to be used by the government. After McClure renewed his request for the tape, the government realized that the tape was not in its possession and so informed the defendant.
 
 
 37
 Confronted with an allegedly fuzzy, and now destroyed, videotape, we find ourselves in the position described by the Supreme Court in California v. Trombetta, 467 U.S. 479 (1983) (finding that police officers' failure to preserve breath samples from breath-analysis tests did not constitute a constitutional violation): "Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Id. at 486.
 
 
 38
 We do not believe that the videotape possessed exculpatory value. In any case, the Youngblood opinion suggests that the standard in preservation-of-evidence cases is whether the defendant can show bad faith on the part of the police in failing to preserve potentially useful evidence. See 488 U.S. at 58. The Court shied away from "imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance...." Id. No bad faith on the part of Agent Miller or the government has been shown.
 
 Indeed the defendant states at one point:
 
 39
 Whether the failure of the government to promptly advise [sic] defendant of either the whereabouts of the critical videotape or that one of the government witnesses would give testimony inconsistent with prior representations of the government was deliberate or negligent, this defendant is not prepared to speculate....
 
 
 40
 McClure's case hence founders upon Youngblood's bad faith requirement.
 
 
 41
 McClure has endeavored to draw sustenance from what has been characterized as the government's belated response, claiming that, had the government notified him in a timely manner, the tape would not have been destroyed. There was, however, no evidence of bad faith by the government in its delayed notification. In fact, the defendant's initial motions were phrased in terms of "and/or bank." Such terminology raises the query of why, if McClure thought enough to mention the bank in the motion, he did not just ask the bank if it had the tape.
 
 
 42
 Two possibilities exist as to the state of the tape at the time of the motions. In either case we would find no violation of a constitutional right. Assuming the tape did not exist in May when the defendant made the initial motions, the government's responses did not worsen the situation. Even if the government erroneously had stated that the bank had the tape, McClure could not have obtained it for use at trial. Alternatively, if the footage did exist during the time motions were made and the government's response foreclosed McClure's opportunity to gain it from the bank, he shows no bad faith by the government, but rather, at the most, negligence. Moreover, the tape would not have changed the jury verdict. The best use for the tape would have been to impeach the teller. The teller was impeached anyway.
 
 
 43
 Thus the district court judge's refusals to dismiss under the various motions were not in error. The judgment is
 
 
 44
 AFFIRMED.
 
 
 
 [1]
 Over a year later, the police criminologist found semen stains on the clothing; however, the stains revealed too small an amount of semen to be conclusive as to the assailant's identity. At the trial, experts testified as to the possible outcomes of the test and the trial judge instructed the jury that, if they found the state had destroyed evidence, they could find the fact against the state
 
 
 [2]
 In McClure's initial motion to dismiss, he argued that the government actually had possessed the evidence when Miller saw the tape at the bank and therefore the tape should be subject to a Brady material request. The judge properly dismissed the argument, stating that he did not think that the evidence established possession. Defendant does not make the argument on appeal