UNITED STATES of America, Appellee,

v.

Michael A. GRILEY, Jr., Appellant.

No. 85–5551.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 11, 1986.

Decided March 26, 1987.

after final judgment on the merits." *Randle,* 664 F.2d at 1065–66.

13. *See e.g., Whisenant v. Yuam,* 739 F.2d 160 (4th Cir.1984).

Charles G. Bernstein, Baltimore, Md., (Diane Lank, Law Clerk, on brief), for appellant.

Glenda G. Gordon, Asst. U.S. Atty. (Breckinridge L. Willcox, Baltimore, Md., on brief), for appellee.

Before ERVIN, WILKINSON, and WILKINS, Circuit Judges.

ERVIN, Circuit Judge:

Michael A. Griley, Jr. appeals from a jury verdict convicting him of violating the National Firearms Act, 26 U.S.C. § 5801 *et seq.* (1982). In challenging his conviction, Griley raises two principal issues.[1] He attacks the government's alleged misrepresentations to the jury regarding a witness's plea bargain. He also challenges the adequacy of the court's instruction on venue. Although we find some merit in the first challenge, the trial court's allowance of the government's alleged misrepresentations is not reversible error. We therefore affirm Griley's convictions.

## I.

In 1984, Michael A. Griley, Jr. lived on the military reservation at Fort Meade, Maryland. Griley's wife was on active duty in the United States Army and Griley was in the army reserves. Five M-16 machine guns were stolen from Fort Meade in April of 1984. Smith, an informant, told the government that Griley had at least one of the guns. Two government agents, FBI Special Agent Sullivan and an agent from the Criminal Investigation Division (CID) of the Department of the Army,

---

1. Griley also raises a host of less significant issues, which we take up in Part III of this opinion.

searched Griley's premises at Fort Meade. They told Griley that they were looking for an M–16 rifle, but they turned up nothing in their search.

This search allegedly prompted Griley to call his mother, Mrs. Tracey, who was in California at the time, and tell her to get rid of "the thing" he had placed in the attic of her home in Virginia. Mrs. Tracey, in turn, phoned George Stevenson, a friend of hers who was occupying her Virginia home, and told him to retrieve the package from the attic. Upon Mrs. Tracy's instructions, Stevenson found an M–16, without a serial number or bolt, broken down in a bag inside a trunk in the attic. He promptly turned over the bag and its contents to the Air Police at the Oceana Naval Air Station.

Griley was indicted by a federal grand jury in the District of Maryland on May 7, 1985. He was charged with possessing an unregistered machinegun, in violation of 26 U.S.C. § 5861(d) (1982) (Count I), and with interstate transportation of an unregistered machinegun, in violation of 26 U.S.C. § 5861(j) (1982) (Count II). After a jury trial before a district judge, Griley was found guilty on both counts. The district judge sentenced Griley to four years on each count, to run concurrently, all but six months being suspended. Griley's motion to stay his sentence pending appeal was denied; he served his sentence in a Baltimore institution. Griley filed a timely notice of appeal with this court.

II.

Griley's first assignment of error relates to testimony by Moran, a government witness. Prior to Griley's trial, Moran had pled guilty to making a false statement on a firearms transaction record, in violation of 18 U.S.C. § 922(a)(6) (1982). As part of

his plea agreement, Moran stated that he would "fully and truthfully" testify at all state and federal trials where his testimony might be relevant. The government subsequently called Moran to testify at Griley's trial, which took place before Moran's sentencing hearing.

In his testimony, Moran stated that he had visited Griley's house in Fort Meade, where Griley pulled out a lower receiver for an M–16, marked "Property of United States Government." Moran testified after he had entered a plea agreement with the government. Griley's attack on this testimony is essentially threefold: he contends that the government did not call Moran's crimes to the attention of the district judge; the government failed to point out Moran's perjured testimony; and the government improperly improved upon its "no recommendation" agreement after trial by urging probation.

The first two points merit little discussion. Griley lists several acts which Moran allegedly performed, including fire-bombing phone booths. According to Griley, the prosecutor reneged on her promise to tell the district judge about these acts. Yet, Griley cites no authority which establishes that the government is bound to recount all of its witness' offenses—many of which were described in the presentence investigation report or in open court—for the district judge's benefit.[2]

■ Griley contends that Moran testified falsely at the trial, and that the government failed to point this out to the jury. In some situations, the government's use of false testimony to obtain a conviction may violate the fourteenth amendment's due process clause. Before a constitutional violation is found, however, certain conditions must be present. Generally, due process is denied if the government knowingly uses

2. Griley refers to the ABA Standards, Prosecution Function, Standard 3–6.2(a). This provision states that the prosecutor must disclose information in the prosecutor's files relevant to the sentence and correct any inaccurate information in her report to the court and to defense counsel. The standard does not directly relate to Griley's claim that the prosecution must set out all of the offenses which a government witness commits before trial begins. Similarly, the sparse case law on the ABA Standards Relating to the Prosecution Function does not address Griley's claim. *See, e.g., United States v. McRoy*, 452 F.Supp. 598, 600 n. 1 (W.D.Mo. 1978), which merely describes information the government supplied to probation office and court concerning certain bribery schemes, in accordance with the ABA Standards Relating to the Prosecution Function.

perjured testimony against the accused to obtain a conviction. *See Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). The government does not have to solicit the false evidence; it is enough if the government allows the evidence to go uncorrected when it surfaces. *Id.*

■ The burden of establishing Moran's perjury presents the greatest stumbling block for Griley. A defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured. *See Dansby v. United States,* 291 F.Supp. 790, 793 (S.D.N.Y. 1968). Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony. *See Overton v. United States,* 450 F.2d 919, 920 (5th Cir.1971).

■ Griley has not met the heavy burden of showing that Moran testified falsely. At trial, Moran described his participation in the army and his involvement in various alleged crimes. Griley claims that Moran has not withdrawn from the army as the plea agreement requires him to do. The plea agreement, however, merely stipulates that Moran will take the necessary steps to sever his ties with the army. On cross-examination, Moran demonstrated that he is taking these steps: he has applied for a discharge and terminated his army commission, among other things. On cross-examination, Moran also denied that he had fire-bombed phone booths at Fort Meade. In attacking this denial, Griley points to the testimony of another witness, Smith, who stated that Moran accompanied him twice when he blew up the phone booths. Yet, Smith's statement creates, at most, inconsistent testimony for the jury to weigh; it does not establish Moran's perjury.

Griley's strongest argument concerns a change in Moran's plea arrangement. The prosecutor's initial plea letter stated: "At his sentencing, the United States Attorney's office will make no recommendation as to the sentence Mr. Moran should receive." The government also reserved the right to oppose a Youth Corrections Act

sentence if the sentence were available. At the sentencing hearing, however, the government changed its recommendation. The prosecution stated:

> Under the terms of the plea agreement, Your Honor, the government agreed to make no recommendation as to sentence, however, ... we have no objection to the Defendant's request that the Defendant be placed on probation in this case. Indeed, we think that that would be appropriate, given what's taken place.

Griley claims that this change in the sentencing recommendation implies prosecutorial misconduct. By including "no recommendation" in the plea letter, Griley argues, the government indicated that it was not going to give Moran special treatment in exchange for his testimony. Yet, the government actually helped Moran by approving his probation. According to Griley, the government thereby misled the jury and the district judge as to Moran's motives to testify truthfully. At trial, Moran explained the terms of his plea agreement; Moran told the jury that he understood that no recommendation would be made as to his sentence. The jury, then, had no reason to think that Moran would favor the government in his testimony.

In her brief and at oral argument, the prosecutor explained her reasons for changing the initial "no recommendation" position. At the sentencing hearing, the prosecutor supported probation because she thought that it was a better alternative to the more lenient Youth Corrections Act sentence which the court was considering. The prosecutor felt that a conviction on Moran's record might temper his fascination with firearms and deter him from committing further crimes. At oral argument, the prosecutor acknowledged that her sudden change in recommendation was unorthodox and might suggest a secret agreement with Moran. She stressed, however, that the government had not made such a secret agreement; the change in recommendation came as a complete surprise to Moran.

Although we do not find that the government's change in sentencing recommenda-

tion after trial amounts to prosecutorial misconduct in this case, we do not sanction the government's actions. Time and time again, the Supreme Court has emphasized the importance of supplying the jury with enough evidence to evaluate a witness's credibility in a criminal case. This is especially necessary when the witness enters a plea agreement with the government. The witness may be inclined to favor the government in his testimony in exchange for lenient treatment in his sentencing.

This danger is illustrated in *Napue v. Illinois, supra.* There, a state's witness, Hamer, testified that he had received no promise from the government in exchange for his testimony. The state's attorney, who knew that a promise to reduce Hamer's sentence had been made, remained silent and did not correct Hamer's false statement. The jury found the defendant guilty of murder, largely on the basis of Hamer's testimony. The Supreme Court unanimously reversed the conviction, holding that it violated the due process clause of the fourteenth amendment. The Court emphasized that "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue,* 360 U.S. at 269, 79 S.Ct. at 1177.

This circuit addressed the issue with which the *Napue* Court grappled in *Campbell v. Reed,* 594 F.2d 4 (4th Cir.1979). In that case, a co-defendant, Miller, denied on cross-examination that he had entered a plea agreement with the state. A plea agreement did, in fact, exist; Miller's attorney had not told him the precise terms of the agreement, but had assured him that "everything would be all right." *Id.* at 6. Miller's testimony led to defendant Campbell's conviction. We reversed the conviction, stressing that the prosecutor improperly remained silent while Miller denied the existence of a plea agreement. We stated that Miller's ignorance of the exact terms of the agreement only enhanced its significance, since he may have seen the tentative promise as turning on his testifying favorably towards the government. *Id.* at 7.

■ *Napue* and *Reed* indicate that when a witness's description of his plea bargain does not comport with the actual terms of the bargain, the jury may not be able to assess the witness's credibility accurately and a due process problem may exist. The government has an obligation to prevent this problem by ensuring that a witness correctly describes his plea arrangement to the jury. In this case, Moran's testimony did not match the exact terms of his ultimate plea bargain. The prosecutor created this mismatch by suddenly and unilaterally changing her sentencing recommendation for strategic reasons. We do not favor such an abrupt change which may, in some circumstances, suggest that a witness will receive favorable treatment from the government of which the jury was unaware.

■ The prosecutor, however, assures us that no secret agenda with Moran existed. It is indeed apparent that the changed recommendation at Moran's sentencing hearing came as a complete surprise to Moran. For this reason, we resist Griley's urging to reverse his conviction on the basis of *Napue* and *Reed.* There is an important distinction between those cases and the present situation. In *Napue* and *Reed,* the actual plea bargain arrangements in effect *at the time of trial* differed from the arrangements which the witnesses described in their testimony. By contrast, in this case, Moran knew the precise terms of the agreement that was initially made, and accurately described them to the jury. The fact that this agreement was later changed, without Moran's knowledge or participation, has no bearing on his incentive to testify for the government. By inference, the change in the agreement also did not influence the jury's assessment of Moran's credibility, or the jury's ultimate decision. The allowance of the prosecutor's changed recommendation, then, constitutes harmless error. *See Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946) (test is what effect error had, or reason-

ably may be taken to have had, upon jury's decision; error which substantially influenced jury's decision is not harmless).

Griley's second assignment of error concerns the trial court's refusal to give his proffered instructions on venue. The indictment charged Griley with interstate transportation of an unregistered M–16 machinegun, in violation of 26 U.S.C. § 5861(j) (1982); Count II stated that Griley knowingly and unlawfully transported the M–16 machinegun "in the State and District of Maryland, and elsewhere." In explaining this charge, the trial judge instructed the jury:

> A relevant portion of the United States Code provides that it shall be unlawful for anyone to transport any firearm in interstate commerce that has not been registered as required by law. Interstate commerce simply means commerce between one state and another. A gun is carried in interstate commerce whenever it is moved or carried across state lines from one state into another state. There are three elements that the government must prove to establish this offense. First, the government must prove that the firearm alleged here, a machinegun, was transported in interstate commerce. Secondly, that it was done knowingly; and third, that the transportation was not authorized by the Secretary of the Treasury.

The court refused to give defendant's tendered instruction, which would have required the jury to find that the gun came from Maryland, as the government asserted, instead of North Carolina, as Griley asserted, in order to sustain a conviction.

The trial court did not err in refusing to give these tendered instructions. Griley argues that the government must prove beyond a reasonable doubt that Griley transported the gun from Maryland, where he was tried, rather than from North Carolina. This argument confuses venue, which is not an element of the crime charged, with interstate transportation, which is an element of the crime and which must be proved beyond a reasonable doubt.

■ The venue issue is governed by 18 U.S.C. § 3237(a) (1982), which provides that "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." A criminal defendant has a constitutional right to be tried in the district in which the crime was committed; the burden of proving that a crime occurred in a particular district is on the prosecution. *See United States v. White,* 611 F.2d 531, 534 (5th Cir.1980). The prosecution, however, does not have to prove where the crime occurred beyond a reasonable doubt, since venue is not a substantive element of a crime. The prosecution need only show by a preponderance of the evidence that the trial is in the same district as a part of the criminal offense. *Id.* at 534–36. Circumstantial evidence alone may be sufficient to find proper venue if the evidence must be considered by the finder of fact. *See United States v. Black Cloud,* 590 F.2d 270, 272–73 (8th Cir.1979).

■ This is not to say that the trial judge's failure to instruct on venue is never fatal to a conviction.[3] In this case, however, the failure to instruct on venue does not constitute reversible error. The evidence strongly indicates that Griley obtained the M–16 in Maryland rather than in North Carolina. For instance, Griley was at his Fort Meade, Maryland home when he displayed the M–16 receiver to Smith and Moran. Griley was also at home when FBI

---

**3.** Indeed, the Fifth Circuit has indicated that the failure to instruct on venue may be reversible error where the trial testimony makes venue a disputed issue and the defendant requests an instruction on venue. *See Green v. United States,* 309 F.2d 852, 856–57 (5th Cir.1962). However, in *United States v. White, supra,* the Fifth Circuit held that the failure to instruct on venue was not plain error where certain condi-

tions existed: the indictment charged venue; the indictment was sent to the jury room during deliberations; the trial judge instructed the jury that it must find the crimes "as charged;" defense counsel argued venue in closing; there was sufficient evidence for the jury to find that the government properly laid venue; and defendant did not request an instruction on venue. *White,* 611 F.2d at 537.

agents visited him and informed him that they were looking for M–16's stolen from Fort Meade, Maryland. The only suggestion that Griley may have obtained the weapon in North Carolina comes from inconsistent testimony by Griley's mother, Mrs. Tracey. Defense counsel asked Mrs. Tracey where Griley had come from when he visited her in Virginia in 1984 (when he placed the M–16 in the attic). Mrs. Tracey first answered "I don't know." Then, in response to the leading question "[W]as it your understanding that he came from Fort Bragg, North Carolina?", she stated: "That was the general place he came from." On redirect examination, the government undercut this testimony by showing that Mrs. Tracey had previously indicated to the grand jury that Griley came from Maryland to visit her.

In a similar situation the Second Circuit held that, even if the trial court had failed to submit the issue of venue to the jury, such error was harmless because of the overwhelming evidence that the offense had been committed in the judicial district where the case was tried. *See United States v. Jenkins,* 510 F.2d 495, 498–99 (2d Cir.1975). Given the compelling evidence that Griley removed the M–16 from Maryland rather than North Carolina, any failure to instruct the jury on venue was harmless error.

### III.

Griley advances several other claims which we can dispose of briefly. Griley first asserts that the trial judge erred in striking for cause a juror who may have had some opinions about plea bargaining. During voir dire, the trial judge asked the potential jurors whether they had any feelings about plea agreements which would affect their evaluation of testimony by witnesses who had entered plea agreements with the government. An unidentified speaker apparently responded: "Opposed to plea bargaining?" The tape of this exchange is muffled; in his brief Griley proceeds on the assumption that the speaker said "I'm opposed to plea bargaining." The court sua sponte struck this juror for

cause. In a subsequent bench conference, defense counsel urged the judge to conduct further inquiry to see if the juror could put aside his feelings against plea bargaining and decide the case strictly on the judge's instructions and the evidence, but the judge refused to do this.

 Griley claims that summary dismissal of the juror violated Griley's sixth amendment right to a fair trial. In this circuit, the conduct of voir dire is within the trial court's discretion. *See United States v. Windsor,* 417 F.2d 1131, 1133 (4th Cir.1969). The trial court may evaluate potential jurors' inflections and gestures, as well as their actual words. *See United States v. Barber,* 668 F.2d 778, 786 (4th Cir.1982). The burden is on the defendant to show that the trial court's conduct of voir dire prejudiced him, and led to an unfair trial. *See United States v. Malloy,* 758 F.2d 979, 982 (4th Cir.1985).

Decisional law, however, has erected barriers to striking jurors for cause. For example, *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961), established that a prospective juror's preconceived opinion as to guilt or innocence does not rebut the presumption of the prospective juror's impartiality if he can lay aside his preconceptions when making decisions.

 In this case, the trial judge struck the prospective juror for cause before determining whether he could lay aside his half-articulated opinions about plea bargaining. Any error in this action, however, is harmless. In his brief, Griley indicated his belief that the prospective juror was opposed to plea bargaining. This implies that the juror would have discounted the testimony of Moran, who plea bargained with the government. Since Moran's testimony was favorable to the government, the exclusion of the juror simply amounted to the exclusion of an individual who would discount testimony by the government's witness. Griley does not demonstrate that exclusion of the prospective juror affected Griley adversely.

 Griley also contends that the trial judge's taped instructions constitute jury

defilement. The trial judge sent a tape into the jury room which evidently included instructions from a prior civil case, as well as the instructions in Griley's case. The court told the jurors about these extra instructions and cautioned them not to play the tape beyond the relevant section. We have indicated that items entering the jury room must prejudice a party in order for reversible error to result. *See United States v. McFadden,* 739 F.2d 149, 153 (4th Cir.), *cert. denied,* 469 U.S. 920, 105 S.Ct. 302, 83 L.Ed.2d 236 (1984). Griley has not demonstrated that the taped instructions were prejudicial to his case. Moreover, corrective instructions, such as the ones the trial judge gave in this case, may cure possible prejudice resulting from the jury's consideration of an item during deliberations. *Id.* at 153.

According to Griley, the government did not adequately prove that Griley possessed a "machinegun," as defined in the National Firearms Act. "Machinegun" is described in 26 U.S.C. § 5845(b) (1982), which states:

The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

Griley claims that the government falls short of meeting this definition for two reasons, neither of which is compelling.

■ First, Griley claims that he possessed only a portion of the machinegun, the frame or receiver. Several witnesses, however, clearly identified the weapon Griley possessed as a "machinegun." An expert from the Alcohol, Tobacco and Firearms (ATF) section of the United States Department of Treasury testified that Griley's weapon was a machinegun. The jury was entitled to credit his testimony; the

finder of fact determines the credibility of expert witnesses and the weight to be accorded their testimony. *See United States v. 7,216.50 Acres of Land, etc.,* 507 F.Supp. 228, 237 (D.S.C.1980); *see also United States v. Oakes,* 564 F.2d 384, 388 (10th Cir.1977) (when expert testimony conflicted as to whether weapon fit under statutory definition, and jury found against defendant, implicit in the verdict was factual finding that gun was a machinegun, as government expert had indicated).

■ Several lay witnesses, including Stevenson, a former member of the National Rifle Association who found the weapon in Mrs. Tracey's attic, also positively identified it as an M–16. The jury was entitled to credit the opinions of lay witnesses such as Stevenson, where these opinions were rationally based on the witnesses' perceptions and helpful in making factual determinations. *See Greenwood Ranches, Inc. v. Skie Construction Co.,* 629 F.2d 518, 522 (8th Cir.1980); Fed.R.Evid. 701, 702. The fact that Stevenson found the weapon in two pieces is not determinative. A machinegun which is capable of being restored to working order falls under the statutory definition. *See, e.g., United States v. McCauley,* 601 F.2d 336, 338 (8th Cir.1979) (machinegun lacking necessary magazine for automatic firing was still a weapon which could readily be restored to shooting automatically and was therefore a "machinegun" for which registration was required); *cf. United States v. Seven Miscellaneous Firearms,* 503 F.Supp. 565 (D.D.C.1980) (weapons which were totally demilitarized, and incapable of firing by manufacturer or government before being donated to museum, were not subject to forfeiture under the National Firearms Act).

■ Griley further contends that the evidence is insufficient to show that the weapon shoots automatically. Yet, the ATF expert, in addition to identifying the weapon as a machinegun, also stated that he had test fired the weapon. Taken together, these assertions are sufficient to show that the weapon was, indeed, a machinegun. *See United States v. James,*

528 F.2d 999, 1015 (5th Cir.), *cert. denied, sub nom. Norman v. United States,* and *Austin v. United States,* 429 U.S. 959, 97 S.Ct. 382, 383, 50 L.Ed.2d 326 (1976) (although rifle in question was not capable of automatic firing and did not fire automatically in test, evidence that it had fired automatically in previous test and that it could be converted to a semi-automatic weapon was sufficient to uphold conviction under 26 U.S.C. § 5681(d) (1982)).

Finally, Griley claims that the search of his Fort Meade home by an FBI special agent and a military investigator with the CID violated the Posse Comitatus Act, 18 U.S.C. § 1385 (1982).[4] Griley argues that any fruits of this unlawful search, including the M–16 rifle, should be excluded. We find Griley's final argument meritless, for two reasons.

 First, it is clear that no Posse Comitatus Act violation occurred. It is well settled that military investigators may look into violations of civil law that occur on military bases, *see United States v. Banks,* 539 F.2d 14, 16 (9th Cir.), *cert. denied,* 429 U.S. 1024, 97 S.Ct. 644, 50 L.Ed.2d 626 (1976), or within military operations, *see United States v. Hartley,* 678 F.2d 961, 977–78 (11th Cir.1982). When the military merely coordinates its ongoing investigation with civil law enforcement officers, the Posse Comitatus Act is not violated. *See, e.g., State v. Maxwell,* 328 S.E.2d 506, 509 (W.Va.1985). Griley's case involves this military/civilian cooperative effort. Five M–16's were stolen from Fort Meade in April of 1984. Because it was not known whether the thieves were military personnel or civilians, the Army's CID worked with the FBI in investigating the thefts. The investigators' path led to Griley's Fort Meade home, where an on-base search was conducted, pursuant to a search warrant issued by a military magistrate.

 Second, even if there had been a Posse Comitatus Act violation, it would not have triggered application of the exclusion-

ary rule in this case. The investigators simply did not seize any evidence pursuant to the warrant. Griley's theory—that the search touched off the chain of events leading to the discovery of the M–16 in his mother's house—is too shaky a basis to support an application of the exclusionary rule. Additionally, we note that the exclusionary rule has not yet been applied to violations of the Posse Comitatus Act. *See, e.g., United States v. Wolffs,* 594 F.2d 77, 85 (5th Cir.1979) (even if activities of Army CID agents leading to defendant's arrest and conviction on drug charges violated Posse Comitatus Act, motion to suppress was properly denied); *United States v. Walden,* 490 F.2d 372 (4th Cir.1974). In *Walden,* we found that the use of United States Marines as undercover investigators violated the Posse Comitatus Act and a companion Navy military regulation. We declined, however, to apply the "extraordinary remedy" of the exclusionary rule to the evidence seized, reserving the right to reopen this question at a later date. "Should there be evidence of widespread or repeated violations ... or ineffectiveness of enforcement by the military, we will consider ourselves free to consider whether adoption of an exclusionary rule is required as a future deterrent." *Id.* at 377. The present case does not call for the reopening that we described in *Walden.* The cooperative efforts by the FBI and CID in searching Griley's on-base home do not amount to a violation of the Posse Comitatus Act, or call for application of the exclusionary rule as a deterrent.

For the foregoing reasons, the judgment is affirmed.

AFFIRMED.

---

4. "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, wilfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both."