935 F.2d 268
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Cecil Arnold ODOM, a/k/a Bud Kelly, Defendant-Appellant.
 No. 90-5074.
 United States Court of Appeals, Fourth Circuit.
 Argued April 12, 1991.
Decided June 11, 1991.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, District Judge. (CR-88-62-JFM)
 Luther Charles West, Baltimore, Md. (Argued), for appellant; Ilene S. Frame, Baltimore, Md., on brief.
 Barbara Slaymaker Sale, Assistant United States Attorney, Baltimore, Md. (Argued), for appellee; Breckinridge L. Willcox, United States Attorney, Baltimore, Md., on brief.
 D.Md.
 AFFIRMED.
 Before MURNAGHAN, Circuit Judge, CHAPMAN, Senior Circuit Judge, and JAMES H. MICHAEL, Jr., United States District Judge for the Western District of Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 A defendant found guilty in a murder trial appeals from various errors allegedly committed by the trial judge involving (1) the refusal to strike a witness' testimony or to instruct the jury to disregard it where the defendant claimed that the government was sponsoring perjured testimony; (2) the admission of evidence about the defendant's prior attempt to solicit friends to support a false alibi; (3) the refusal to strike the government's comment on the absence of the defendant's alibi witness; and (4) the denial of a new trial based on the finding that the defendant's alibi witness, who finally had appeared, lacked credibility. We find all the arguments are ultimately without merit.
 
 
 2
 * After an unsuccessful appeal asserting the impropriety of the trial on double jeopardy grounds, see United States v. Odom, 888 F.2d 1014 (4th Cir.1988), cert. denied, 111 S.Ct. 44 (1990), Cecil Arnold Odom, a.k.a. Bud Kelly, once again appears before the court. Odom appeals from his trial, which addressed the events of the night of June 13, 1987 and the morning of June 14, 1987. Primary interest focused on the death of Leonas John Vitkauskas, a small time criminal and expected federal witness against Dale Joseph Benjamin, Sr., who, along with others, had stolen an armored car in 1986. On June 14, Vitkauskas was driven to Anne Arundel County, shot twice, and then run over by the car.
 
 
 3
 Certain aspects of that night remain unclear. However, the government claims and produced evidence at trial that the events occurred as follows. On June 8, Benjamin telephoned from the Cecil County Detention Center where he was incarcerated and told Odom that Vitkauskas was an informer. Odom and Vitkauskas had robbed vending trucks. Odom told Victor Carroll Fincham, a fellow drug dealer and the owner of the establishment, My Bar. Odom and Fincham discussed killing Vitkauskas and eventually developed a plan with Cleveland Everett "Reds" Miller. On June 13, Vitkauskas came to My Bar at Miller's request; Miller arrived at My Bar and spoke to Fincham; Odom and Vitkauskas left My Bar with Miller following. The three men drove for a while and then, in the early morning hours of June 14, after they stopped to relieve themselves, Miller shot and ran over Vitkauskas. Miller dropped Odom off at his house and returned to My Bar where Fincham gave him $500.
 
 
 4
 In February 1988, Fincham, Benjamin, and "Reds" Miller were indicted for, inter alia, conspiracy to murder a federal witness. In May 1988 Fincham was severed. Miller was convicted. Benjamin was acquitted.
 
 
 5
 Miller then agreed to testify against Fincham and Odom, who were subsequently indicted. After Odom was severed from the Fincham-Odom trial in October 1988, Fincham was convicted. Fincham then agreed to testify against Odom.
 
 
 6
 Odom's trial began on April 2, 1990. At the trial, Fincham and Miller testified. Odom requested that the Fincham testimony, which he claimed was perjured, be stricken or else mitigated by a jury instruction to disregard it. He believed the testimony perjured because it differed from testimony given by various witnesses, in particular, Miller, at the other earlier proceedings related to the Vitkauskas murder. The judge denied the motion. In addition, Odom claimed that the government also had sponsored the perjured testimony of FBI Agent George G. Chmiel. Odom argued that testimony about his attempt to create an alibi for a state cocaine charge was irrelevant, prejudicial, and inadmissible under Federal Rule of Evidence 404(b). The judge admitted the evidence. Odom objected to closing statements by the prosecutor which referred to Odom's girlfriend, Sherri Sherman, a.k.a., Sherri McQuade, who had been "unavailable" during the trial. Odom had stated that he had been with McQuade on the night when Vitkauskas was shot. Odom claimed that he had no control over McQuade and therefore, implications drawn from her absence were improper. The judge did not give a missing witness instruction but also refused to strike the comment, leaving it to the argument of counsel.
 
 
 7
 The jury found Odom guilty. On July 17, 1990, Odom filed a motion for a new trial on grounds of newly discovered evidence and fraud. Odom stated that he had finally become aware of McQuade's location and submitted an affidavit explaining her absence. She claimed that FBI agents had threatened to prosecute her for perjury and cocaine possession if she testified on Odom's behalf. On July 19, the motion was denied. The district judge decided that no reasonable person could believe McQuade's affidavit and testimony. Odom argued that the jury, not the judge, should rule on McQuade's credibility; the judge disagreed as a matter of law.
 
 
 8
 Odom was sentenced to life plus ten years and he appeals.
 
 
 9
 On appeal, Odom raises four issues. First, he argues that the government permitted Fincham's testimony without any indication to the jury that the government believed much of the testimony to be perjured or any attempt by the government to correct the impression given by Fincham of the events, and that the government permitted perjured testimony from the FBI agent. Second, he claims that the evidence about his earlier alibi attempt should not have been admitted. Third, he argues that the comment about McQuade's absence was impermissible. And fourth, he states that a new trial should have been granted.
 
 
 10
 The government objects to all the claims. With respect to the perjured testimony, it argues that it did not suppress evidence, that the fact that the recollections differed was a reasonable problem with which to present the jury, that there is little basis for concluding that Fincham was lying in some of the instances, and that the FBI Agent's testimony is tangential to the case. The government claims that the jury could decide whether and in what respects to believe Fincham or Miller; indeed, the government emphasizes that it called Miller to the stand, thereby demonstrating that Fincham or Miller should not be entirely believed. The government also argues that evidence that Odom had attempted to defend himself against a state cocaine charge by asking people to give false alibis was relevant. The government states that even if the evidence does not fit a usual Rule 404(b) category, it was relevant and unprejudicial--and was "at most an error of timing" because it could have come in on rebuttal. With respect to its comment about McQuade's absence, the government claims that it appeared that getting McQuade to testify was within Odom's power, and that, in any case, the comment was harmless error. Lastly, the government argues that the judge's decision to deny a new trial was not clearly erroneous because no reasonable person could have credited McQuade's testimony.
 
 II
 A. Perjured Testimony
 
 11
 Odom lists a number of instances where Fincham gave, and the government sponsored, allegedly perjured testimony.[1] Odom argues that Fincham had to be committing perjury because his testimony differed from Miller's. For example, Fincham testified that Odom wanted Vitkauskas killed because Vitkauskas was informing the FBI about the armored car theft. Odom claims that Fincham wanted Vitkauskas killed because Vitkauskas had informed the FBI about Fincham's cocaine dealings. Miller apparently stated that Odom and Fincham both wanted Vitkauskas killed. In another example, Fincham testified that Reds Miller told him about the murder merely because he had agreed to hold the payment for Reds Miller, and that he only "strongly suspected" what was going to happen to Vitkauskas when he saw Reds Miller and Vitkauskas. Odom claims that Fincham had arranged the murder. Miller apparently testified that Fincham had paid him $500 (which he assumed but did not know for certain was Fincham's), a six-pack of Budweiser, and forgiveness of a drug debt.
 
 
 12
 Odom then contends that, without Fincham's testimony, the jury would not have been able to convict him because Miller's testimony standing alone was contradictory and had been "severely impeached" on cross-examination. For example, Odom asked Miller why Miller had testified before the grand jury that Odom had told Miller to find Vitkauskas at the B and O Bar on the day of the murder but later at Fincham's trial had testified that Fincham had told him. Miller said that he simply made a mistake and it was Odom who told him. Odom asked why Miller had testified at the grand jury that he had made the deal with Odom to do the murder and, at the Fincham trial, had testified it was with Fincham. Miller said that Fincham and Odom were in it together. Odom asked why Miller had not added Odom's name when he said at the grand jury hearing that his only regret was that he had not killed Fincham for suggesting it. Miller said that Fincham was in jail with him and on his mind. And Odom asked why Miller had testified at the grand jury that he was "hired to kill this man by Victor Fincham and Dale Benjamin," and yet at Odom's trial testified that Odom was supposed to do the actual killing. Miller claimed that he made a mistake.[2]
 
 
 13
 "A defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured." United States v. Griley, 814 F.2d 967, 971 (4th Cir.1987). Odom has attempted to demonstrate that the testimony was perjured because inconsistencies abounded. However, "[m]ere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." Id. at 971; see United States v. Verser, 916 F.2d 1268, 1271 (7th Cir.1990). Indeed, as a logical matter, Odom's argument is itself somewhat inconsistent in that it depends on Miller's testimony being partly truthful and partly perjurious. Odom's argument requires (1) Fincham to have been lying when he said he was not involved and Odom was involved; and (2) Miller to have been lying when he said that Odom was involved. But Odom can only reach the first conclusion that Fincham was lying by accepting Miller's testimony. Yet, the second conclusion is based on his own demonstration of the inconsistency in Miller's testimony.
 
 
 14
 Moreover, the disputed testimony never cast doubt on Odom's involvement. As the government even suggested to the jury, the tough question involved whether both Fincham and Miller had concluded they would "get" Odom by implicating him in a murder. In fact, the conflicting testimony from Fincham and Miller may have benefitted Odom by creating the possibility that the jury would find Miller's and Fincham's tales of Odom's involvement no more than a vindictive lie. The jury could have believed one, believed the other, or believed neither and set Odom free. But it did not. It pieced together a factually credible story from the, at times somewhat conflicting, testimony.
 
 
 15
 Unlike some perjured testimony cases, Odom's argument is not that the government refused to disclose information; rather, he disputes the government's decision to put on all the conflicting testimony it had. The government acknowledges that it has an obligation "not only to avoid presenting false testimony ... but also to correct false testimony when it is given by a government witness." See Napue v. Illinois, 360 U.S. 264, 269 (1959); Griley, 814 F.2d at 971. The government actually warned the jury that the witnesses' testimony would conflict as to some aspects of the case. But the government is not required to guess about whether testimony is true or false. The prosecutor, by "presenting witnesses with contradictory stories," does not necessarily present perjured testimony. United States v. Sherlock, 865 F.2d 1069, 1082 (9th Cir.1989). "Without knowledge of whose testimony was false ... [the prosecutor] would not have knowingly presented perjured testimony." Id. at 1082 (emphasis in original). Choosing Miller over Fincham or Odom over Miller, as the more "truthful" testifier was not the government's responsibility. At least it was not feasible in the present case.
 
 
 16
 The jury was made aware that both men were telling less than the complete truth. Despite Miller's apparent attempt to finger Fincham and Fincham's attempt to minimize his involvement, both men insisted consistently that Odom had been involved in the murder. The government did not sponsor perjured testimony by leaving the resolution of the inconsistencies to the jury. The judge did not err by failing to strike the evidence or issue a limiting instruction. Credibility remains an issue for the jury.
 
 B. Evidence of Prior Solicitation of Alibi
 
 17
 Odom's next argument concerns Fincham's testimony that Odom had attempted to convince Fincham to aid him in a phony alibi to avoid a narcotic violation charge:
 
 
 18
 Q. What did he tell you about his defense?
 
 
 19
 A. He wanted to use one of my leather jackets which was like the leather jacket that his cocaine was found in and he was going to deny that was his coat and present my coat to say that was his.
 
 
 20
 Q. Did he want you to be an alibi witness for him?
 
 
 21
 MR. WEST: Objection.
 
 
 22
 COURT: Overruled.
 
 BY MR. WILLCOX:
 
 23
 Q. Did he want you to be an alibi witness for him?
 
 
 24
 A. No, sir.
 
 
 25
 Q. Did he want you to claim it was your coat?
 
 
 26
 A. He wanted to borrow my coat, sir. The other coat he wanted to say belonged to one of the customers, it wasn't his coat that the cocaine was found in.
 
 
 27
 .............................................................
 
 
 28
 ...................
 
 
 29
 * * *
 
 
 30
 Q. Mr. Fincham, I'm not sure I understand. Mr. Kelly wanted you to offer what explanation about coats?
 
 
 31
 A. That the coat that the cocaine was found in was not his coat, that he was going to present my coat and say this is his coat, the one that was clear and clean.
 
 
 32
 And the one that the cocaine was found in, he was denying that was his coat.
 
 
 33
 The judge overruled Odom's objection to the evidence. Odom argues that the evidence does not fall within any exception under Rule 404(b) of the Federal Rules of Evidence and was only admitted to prove bad character. The government argues that the evidence was meant to prove something other than merely bad character and thus is admissible under Rule 404(b). Because the evidence was relevant, the government claims the judge did not abuse his discretion. In addition, the government notes that Odom later testified about the wrong-coat incident defense during crossexamination without objection. According to the government, therefore, no prejudice occurred because the government could have asked about the incident on cross-examination.
 
 
 34
 Federal Rule of Evidence 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." In United States v. Rawle, 845 F.2d 1244 (4th Cir.1988), the court wrote,
 
 
 35
 however, prior bad acts are admissible if they are (1) relevant to an issue other than character, (2) necessary, and (3) reliable. The prosecution may introduce evidence of prior bad acts to show "proof of motive, opportunity, intent or absence of mistake or accident." This list, however, is not exhaustive.
 
 
 36
 Id. at 1274 (citation omitted). Thus Rule 404(b) is "an 'inclusionary rule' which 'admits all evidence of other crimes [or acts] relevant to an issue in a trial except that which tends to prove only criminal disposition.' " Morgan v. Foretich, 846 F.2d 941, 944 (4th Cir.1988) (citations omitted) (emphasis in original); see United States v. Watford, 894 F.2d 665, 671 (4th Cir.1990). The judge's decision is reviewed for abuse of discretion. See United States v. Fells, 920 F.2d 1179, 1182 (4th Cir.1990), petition for cert. filed (Mar. 11, 1991) (No. 90-7358); United States v. Lewis, 780 F.2d 1140, 1142 (4th Cir.1986).
 
 
 37
 The earlier incident involving Odom's attempt to solicit an alibi was not introduced only to prove criminal disposition. The incident bore relevance to Odom's attempt to manufacture an alibi defense in the present case. See Morgan, 846 F.2d at 944 (permitting evidence under Rule 404(b) that "negated several defenses raised by the defendants"). Cf. United States v. Porter, 821 F.2d 968, 977-78 (4th Cir.1987), cert. denied, 485 U.S. 934 (1988) (admitting evidence of earlier drug incidents to show motive, knowledge, and state of mind). Furthermore, the probative value of the evidence was not "substantially outweighed by its prejudicial effect." Morgan, 846 F.2d at 944 (emphasis in original). There was no "genuine risk that the emotions of the jury will be excited to irrational behavior" by the evidence. Id. at 945. The judge admitted the evidence, noting, "At some point in the case I can reconsider." Later, however, Odom answered questions on cross-examination about the incident without apparent objection. The admission was not an abuse of discretion.
 
 C. Comments on Absence of Alibi Witness
 
 38
 Odom's third objection is to comments made by the prosecutor in closing argument. At trial, Odom claimed that he had an alibi--he had spent the night with his girlfriend, Sherri McQuade. She did not appear or testify at the trial, although the defense did produce a private investigator who testified that he had searched for her. The court refused the government's request for a "missing witness" instruction. The judge apparently stated, "I think you have set it up well for your argument. My initial reaction is that it should not be given.... The investigator tried to subpoena her and was unable to do so.... [I]t's sort of putting my imprimatur on one side over another."
 
 
 39
 During the government's closing argument, the government stated:
 
 
 40
 In this human cesspool where the only crime is to be caught, he [the defendant] had his ready-made alibi just as he had it before.
 
 
 41
 Do you recall the testimony about when he got arrested on the drug deal there had been a fight in the bar or something like that? He went outside and got arrested with some cocaine in the pockets of his coat. And he had cooked up a defense to that. The defense was going to be that he just picked up the wrong coat. And he was going to have Sherry Sherman [McQuade] and two other girls ... come in and testify to that. And that would have been a lie. That was his coat; that was his cocaine. They wouldn't lie for him then; Sherry wouldn't lie for him on this occasion.[3]
 
 
 42
 Ask yourselves, ladies and gentlemen, if he was home with Sherry Sherman, and she cared about him, wouldn't she be in here testifying? Where is she?
 
 
 43
 Odom's counsel objected. The court overruled the objection, stating "You can all argue the evidence on that."
 
 
 44
 Odom argues that "[i]t is only when a witness, whose testimony would elucidate facts in issue, is controlled by one party where failure to call the witness creates an inference which the jury is permitted to draw against the party that controls the witness." Odom claims that McQuade was not within his control. The government responds that McQuade was "certainly more available to the defense than to the prosecution." For example, the government claims that McQuade had actually consented to one interview with counsel and had visited Odom in jail before evading service. The government states that it never was in contact with her during Odom's trial.
 
 
 45
 The refusal to give the missing witness instruction has not been appealed by the government; however, if there had been evidence suggesting that the court might have "view[ed] the informant's unavailability as suspect," Burton, 898 F.2d at 598, issuance of the instruction might have been justified. A "missing witness" instruction requires that the missing person be "peculiarly within the power" of the party against whom the instruction is given and that the testimony of that person would elucidate the transaction. See United States v. Romo, 914 F.2d 889, 893 (7th Cir.1990), cert. denied, 111 S.Ct. 1078 (1991); United States v. Burton, 898 F.2d 595, 597 (8th Cir.1990).
 
 
 46
 But the denial of a missing witness instruction need not always be accompanied by the barring of all government comments on the witness' absence. The Seventh Circuit has written, "[i]n a close case, it may be appropriate to allow a party to comment in argument on the significance of a witness' absence, even where there is insufficient evidence of unavailability to warrant a missing witness instruction." United States v. Keplinger, 776 F.2d 678, 702-3 (7th Cir.1985), cert. denied, 476 U.S. 1183 (1986); see United States v. Sblendorio, 830 F.2d 1382, 1394 (7th Cir.1987), cert. denied, 484 U.S. 1068 (1988). McQuade does not appear to have been "equally unavailable" to both sides. See Romo, 914 F.2d at 896. The reasons for McQuade's unavailability were sufficiently ambiguous so that, although it might have been no abuse of discretion not to have permitted the comment, the judge did not abuse his discretion by permitting it.
 
 
 47
 In any case, the comment did not prejudice Odom so as to require reversal. See United States v. Cook, 771 F.2d 378, 382-83 (8th Cir.1985); Moore v. Wyrick, 760 F.2d 884, 887 (8th Cir.1984). The testimony of Fincham and Miller indicated Odom's involvement in the murder. Two women apparently testified that they were with McQuade until the bar closed at 2:00 a.m. and had seen Odom leave earlier. The verdict has not been cast into doubt because of the comment. See Cook, 771 F.2d at 383.
 
 D. Denial of New Trial
 
 48
 Odom's fourth contention is that the judge incorrectly denied Odom's motion for a new trial based on McQuade's post-trial appearance and affidavit. A motion for a new trial is subject to an abuse of discretion standard. See, e.g., United States v. Parker, 903 F.2d 91, 103 (2d Cir.), cert. denied, 111 S.Ct. 196 (1990); United States v. George, 568 F.2d 1064, 1072 (4th Cir.1978).
 
 
 49
 After the trial, Odom brought a motion for a new trial accompanied by McQuade's affidavit that she had been with Odom the night of the murder but had been afraid to testify at the trial because of threats from the FBI. In particular, McQuade stated that several weeks before the trial the FBI agents came and told her that if she testified that she had been with Odom she would be charged with perjury. Furthermore, she claimed that they threatened to charge her with selling cocaine if she testified. She stated that she made herself "scarce."
 
 
 50
 At the hearing, after listening to evidence presented through the cross-examination of McQuade, a local attorney, and two FBI agents, the judge concluded:
 
 
 51
 I simply don't credit the testimony of Ms. McQuade. It doesn't make any sense to any person with any common sense at all.... This story just isn't true, it's facially apparent that it is very convenient to come up on the day of sentencing, what could be a better time for Ms. McQuade to finally show up. There is no indication in this record whatsoever that the FBI threatened her, prevented her from appearing at trial and I therefore deny the Motion for a New Trial.
 
 
 52
 Odom insists that the judge should have submitted the question of McQuade's credibility to a jury. Odom admits that much of McQuade's testimony was confusing but states that the essential point that she did not appear at trial or for service of process because she had been threatened by the FBI for perjury and possession of cocaine was not in question. Odom emphasizes that the FBI agents testified that they told her that if she came to trial and lied, she "could possibly be prosecuted under the penalties of perjury." The government contends that McQuade's testimony at the hearing was replete with discrepancies. In addition, the government argues that the judge's finding of fact that she was not credible was not clearly erroneous.
 
 
 53
 Improper prosecutorial behavior constitutes error warranting a new trial. United States v. MacCloskey, 682 F.2d 468 (4th Cir.1982) and United States v. Morrison, 535 F.2d 223 (3d Cir.1970) held that such behavior resulting in the refusal by key defense witnesses to answer certain questions on the grounds of possible incrimination necessitated new trials. The trial judge recognized the validity of those cases by commenting, "Now obviously if an agent in the FBI or anybody--any other agent threatened an alibi witness from coming into the Court that would be ground for a new trial." The court, however, found that such threatening did not occur.
 
 
 54
 The judge did not err in concluding that McQuade was not prevented from testifying by threat or even by suggestion of threat and that her testimony was not credible. McQuade's testimony at the hearing and her affidavit were confused and inconsistent. For example, the FBI agent testified that he had conducted an interview with McQuade in April 1988 before Odom was ever charged. McQuade, however, was never clear on when the FBI interview in which she claimed she had been threatened had occurred. McQuade's affidavit declared that "several weeks prior to the Cecil Odom trial," FBI agents visited her. At the hearing, she stated that this visit had occurred "six months ago." When asked which year, she answered that it had been before his trial and upon further questioning by Odom's counsel, "his first trial." Later, when the judge asked "before the first trial in what case?" Odom's counsel stated "Well, before Fincham and Reds Miller and Dale Benjamin were tried...." McQuade ultimately implied that she had been visited prior to that case. Yet on cross-examination, McQuade agreed when the prosecutor suggested that the interview had been just before the most recent Odom trial.
 
 
 55
 In addition, McQuade's versions of her "disappearance" were unusual. McQuade's affidavit declared that after the FBI visit, "I was afraid to testify and 'I made myself scarce.' " The affidavit of E. Thomas Maxwell, Jr., Odom's attorney who had represented McQuade in a personal injury suit for a February 1990 accident, declared that she had been unavailable in April 1990. He stated that when he had spoken with her in July 1990 she claimed that she had gone to South Carolina "during the time prior to the end of Cecil Odom's trial" because of FBI threats. At the hearing, however, McQuade said that she had gone to South Carolina for two weeks at the beginning of June. When Odom's counsel pointed out that Odom had been tried in April she stated that, at that time, she "was still hiding" "on Rappolla Street in Allentown [sic]." Even her explanations of the content of what the FBI had allegedly threatened her with changed. In her affidavit she stated that the FBI had threatened her with a picture that they claimed to possess which portrayed her snorting cocaine; however, at the hearing, she only talked about alleged nude pictures held by the FBI that she learned about from her mother, who had been told by another woman. And in her affidavit she stated the FBI had told her she would be charged with perjury; however, at the hearing, when Odom's attorney read her that statement from her affidavit, she responded, "That I could be."
 
 
 56
 The FBI agents acknowledge that they had told her that she could be prosecuted for perjury if she did not tell the truth in connection with their attempt to get her to testify at the grand jury hearing and in their investigation they later discovered that she had lied. However, their statements were not threats or even suggestions of threats about testifying at Odom's trial. The dissent in United States v. Teague, 737 F.2d 378 (4th Cir.1984), cert. denied, 469 U.S. 1161 (1985), explained that "[i]t is possible that a single, factual mention of the consequences of perjury, perhaps in response to direct questioning by the witness, may not constitute misconduct or harmful error in some circumstances." Id. at 387. The present case falls outside the "spectrum of prosecutorial misconduct." Id. Moreover, unlike the defense witnesses in prosecutorial misconduct cases such as Morrison and MacCloskey, McQuade did not even come to court and refuse to answer specific questions because of self-incrimination or perjury concerns. She just did not show up at all.
 
 
 57
 Whatever the reason for McQuade's absence at trial, the judge did not err in concluding that it was not due to threats or even suggestions of threats by the government. Moreover, given McQuade's problems in explaining her absence from the trial, as well as her admission that she heavily had used drugs and alcohol when she lived with Odom, it is dubious that her evidence " 'would probably produce a new result.' " United States v. Lott, 751 F.2d 717, 721 (4th Cir.1985), cert. denied, 470 U.S. 1087 (1986) (citation omitted); see United States v. Bales, 813 F.2d 1289, 1295 (4th Cir.1987). The judge did not err in denying the motion for a new trial.
 
 
 58
 AFFIRMED.
 
 
 
 [1]
 Odom also alleges that the government sponsored the perjured testimony of FBI Agent George G. Chmiel. The Chmiel testimony arose during Odom's apparent attempt to establish FBI threats against potential witnesses to the Vitkauskas murder trial. Odom asked Chmiel if he had threatened Mary Benjamin or her children. Benjamin was married to Joseph Benjamin, Sr., the man who had allegedly first telephoned Odom about Vitkauskas. She had been a witness in an earlier trial but was not in Odom's. Chmiel and a local detective, Hauf, stated that they did not threaten Mary Benjamin. Hauf's notes were admitted. Odom attempted to get the men to admit that the notes referred to "Mary" rather than "Gary," allegedly indicating that they had threatened her. Both men denied the allegation
 This is not a case where, after the trial, defense counsel came upon undisclosed material that suggested that testimony by a government witness had been perjured. The notes were admitted into evidence and Odom's counsel brought out the possibility that the agents actually had threatened her. Odom did not show that the government knew or should have known that Chmiel's testimony was perjured. He believed his interpretation of Hauf's notes but suchbelief does not establish "the government's knowing use of false testimony." United States v. Griley, 814 F.2d 967, 971 (4th Cir.1987). Odom also does not appear to have made any motion based on the Chmiel testimony in the district court. We find no merit to the allegation of knowing governmental use of perjured testimony.
 
 
 [2]
 The impeachment hardly began to exonerate Odom. The first two items suggest that during the grand jury hearing Miller placed Odom in a central role and Fincham in the minor role; however, the latter two indicate that at the grand jury hearing Miller had given Fincham the major role in the murder
 
 
 [3]
 Both sides agree that the transcript is incorrect and the word "then" belongs in the sentence as appears above. The transcript read "They wouldn't lie for him. Then Sherri wouldn't lie for him...."