**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                      No. 95-5580

GARY WILLIAMS,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CR-94-541-A)

Argued: March 5, 1996

Decided: May 24, 1996

Before HALL, WILKINS, and WILLIAMS, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** James Clyde Clark, LAND, CLARK, CARROLL &
MENDELSOHN, P.C., Alexandria, Virginia, for Appellant. Diana
Lynn Preston, Special Assistant United States Attorney, OFFICE OF
THE UNITED STATES ATTORNEY, Alexandria, Virginia, for
Appellee. **ON BRIEF:** Helen F. Fahey, United States Attorney,
OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Vir-
ginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Gary Williams appeals the convictions stemming from his involvement in a prison disturbance. We find no error, and we affirm.

I

A

Williams is an inmate at Lorton Reformatory, a District of Columbia prison located in Virginia. On June 16, 1994, inmates John Edwards, Joseph Leaks, and Williams were involved in a fight in which Edwards was stabbed repeatedly with a plexiglass shank. Leaks and Williams were indicted and tried together for assault with intent to murder, possession of the shank, and other crimes.

The first witness at the trial was Sergeant William Moseley, a correctional officer who was on duty on the tier where the fight occurred. When first asked to identify the defendants, he reversed their names. Although this mistake was pointed out by the Assistant United States Attorney, Moseley's confusion continued. He testified that a fist fight began between Edwards and Leaks and that Williams became involved later. At one point, he named Leaks as the assailant with the shank, and the prosecutor's next two questions concerned the manner in which Leaks used the shank. Moseley, who had worked on the tier on only a "sporadic" basis, did not know either of the defendants by name prior to the incident.

On cross-examination by Leaks' counsel, Moseley again named Leaks as the shank user, but he pointed to Williams when asked to identify the defendant responsible for the stabbing. Attempting to somehow capitalize on Moseley's confusion, Williams' counsel questioned Moseley about the same misidentification of the defendants in

2

the incident report the officer filled out the day after the attack. After extended questioning, however, Moseley's testimony took on an increasingly certain tone--it was Leaks and Edwards who were in a fist fight, and it was Williams who joined the fray and stabbed Edwards.

The next witness was not confused. Corporal Daryll Godlock, in responding to Sergeant Moseley's call for assistance, came upon a fist fight involving Leaks and Edwards when he saw Williams "jump out of his cell with a long sharp-pointed object and stab inmate Edwards three times in the chest area." Godlock's identification of the defendants and the role each played in the altercation remained consistent throughout cross-examination. Leaks was acquitted of all charges, and Williams was acquitted of all charges except possession of the shank.

B

The presentence report referred to an FBI report that Williams' counsel asserts had not been made available to him during pretrial discovery. This FBI report, which had been prepared from an interview with Moseley one month after the assault, has Williams getting into the initial verbal confrontation with Edwards and Leaks doing the stabbing.

Prior to the sentencing hearing, Williams moved for a new trial based on the government's failure to provide the FBI report before trial and the use of Moseley's "false" testimony. The government countered with a variety of arguments, including that, in accordance with the open file policy of the United States Attorney's office, the FBI report was in the file when it was made available for inspection. During oral argument on the motion, Williams' lawyer reiterated his claim that the FBI report was not in the file when he examined it prior to trial. Before the government could respond, the court denied the motion on the grounds that "the defendant was aware of it at trial and I can't believe that that would have affected the outcome of the case."

On June 23, 1995, Williams was sentenced to 2 years' imprisonment, to be served consecutively to the lengthy sentence he is currently serving. Williams appeals the judgment of conviction and the order denying a new trial.

3

II

Williams contends that he is entitled to a new trial because (1) the government knowingly presented false testimony at the trial; (2) the FBI report contained material evidence favorable to him and, therefore, under Brady v. Maryland, 373 U.S. 83 (1963), it should have been disclosed to him prior to trial; and (3) the report constitutes newly discovered evidence under Fed. R. Crim. P. 33. These arguments are related, yet each entails a slightly different analysis and standard of review. We turn first to the contention that the government knowingly presented false testimony.

A

Interwoven with Williams' Rule 33 and Brady arguments is the claim that the government suppressed the FBI report and knowingly permitted Moseley to perjure himself. The knowing use of perjured testimony would force the government to demonstrate that the use of such testimony was "harmless beyond a reasonable doubt." United States v. Bagley, 473 U.S. 667, 679 n.9 (1985). From Williams' standpoint, this is a vastly more favorable standard of review than Brady's "reasonable probability" of a different result. However, Williams fails to make any creditable showing that Moseley was anything other than confused about which face belonged to what name. After extended cross-examination, his rendition of events matched Godlock's in every important respect. Inconsistent testimony from a government witness does not amount to the knowing use of false testimony. United States v. Griley, 814 F.2d 967, 971 (4th Cir. 1987). Absent a threshold showing of falsity, we need not consider this argument any further.**1**

_____

**1** Attached to the motion was the transcript of a post-trial telephone conversation between Moseley and an investigator retained by Williams in which Moseley said he had never observed Williams with a shank. In a footnote to a memorandum of law in support of his motion, Williams' lawyer notes that a juror approached him after trial and told him that "the apparently inconsistent verdicts were a result of the testimony of Moseley regarding Defendant's action in handing him a shank." We are unable to find where Moseley ever testified that Williams handed him the shank.

B

Under Brady, the government is under an obligation to provide to a defendant any material exculpatory evidence in its possession.**2** "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley , 473 U.S. at 682. Impeachment evidence is included under Brady. Giglio v. United States, 405 U.S. 150, 154 (1972). Even if it is assumed that the FBI report was not disclosed to the defense and, further, that the report would have been used in an attempt to impeach Moseley's testimony, Williams' Brady argument falls short because it is unlikely that a different verdict on the shank possession would have been obtained.

As we have noted, Moseley did not know the defendants by name at the time of the altercation. He initially reversed their names at trial, and this reversal echoed his incident report and his statement to the FBI agent. Defense counsel, however, were unrestricted in their attempts to use Moseley's confusion to throw the blame onto each other. By the end, however, Moseley was telling a consistent story that was supported by Corporal Godlock. There is simply no "reasonable probability" that access to the FBI report would have changed the result at trial.

C

Fed. R. Crim. P. 33 provides that "the court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice." We review the denial of a new trial for abuse of discretion. United States v. Bales, 813 F.2d 1289, 1295 (4th Cir. 1987). We find no abuse of that discretion here.

_____

**2** By order dated February 15, 1995, the district court ordered the government to make available for inspection to the defense lawyers "the portion of any written record containing the substance of any relevant oral statement made by the defendants . . . in response to interrogation by any person then known to the defendants to be a government agent. . . ." The FBI report clearly falls within the ambit of this order.

5

Even if we again assume that the FBI report was not disclosed to defense counsel prior to trial and, further, that it was not otherwise discoverable by the defendant even through due diligence, the report is not the type of newly discovered evidence that would merit a new trial under Rule 33. First, the report is cumulative. Sergeant Moseley's incident report, which apparently was made available to the defendants, contained the same misidentification found in the FBI report. Second, the FBI report could only have been used for impeachment purposes. Id. (newly discovered evidence that is cumulative or merely impeaching is not grounds for a new trial under Rule 33).

Finally, newly discovered evidence must also be such that it "would probably produce an acquittal." Id.  We agree with the district court bench ruling that access to the report "would not have affected the verdict." Moseley's confusion was evident from the outset, and Williams had ample opportunity to explore the matter at trial. That he was just as mistaken a month after the incident (when the FBI interview took place) as he was the day after the incident (when the incident report was prepared) is not the type of evidence that "probably" would have tipped the balance in Williams' favor here. Therefore, we affirm the order denying the motion for a new trial on the grounds of newly discovered evidence.

AFFIRMED

6